**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHRISTOPHER TROWBRIDGE, MICHAEL
TORRES, RONNIE PAGAN, and JUAN
ORTIZ, individually and on behalf of a class of
all others similarly situated;

Plaintiffs,

-v-

ANDREW CUOMO, in his official capacity as
the Governor of the State of New York; JANET
DIFIORE, in her official capacity as Chief Judge
of the State of New York and Chief Judicial
Officer of the Unified Court System; and
LAWRENCE MARKS, in his official capacity
as Chief Administrative Judge of the Unified
Court System;

Defendants.

16 Civ. 3455 (GBD)

ECF Case

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FACTS .....................................................................................................................2

LEGAL STANDARD ...............................................................................................4

ARGUMENT ...........................................................................................................5

I.      PLAINTIFFS HAVE STANDING BECAUSE THEY WILL LIKELY BE
        CHARGED WITH MISDEMEANORS IN BRONX CRIMINAL COURT .................5

        A.      People Who Repeatedly Encountered a Policy in the Past and Are Likely
                to Encounter It Again Have Standing to Challenge Its Future Application..........5

        B.      Plaintiffs Allege that They Are Likely to Be Charged with Misdemeanors
                in Bronx Criminal Court ................................................................................7

II.     ABSTENTION IS IMPROPER BECAUSE PLAINTIFFS' CLAIMS DO NOT
        PRESENT "EXCEPTIONAL CIRCUMSTANCES" WARRANTING THE
        ABDICATION OF FEDERAL JURISDICTION ..........................................................10

        A.      The Categorical Approach to Abstention Enunciated in Sprint Fatally
                Undermines Defendants' Reading of Younger ..................................................11

        B.      Plaintiffs Do Not Seek an Injunction Controlling the Outcome of Specific
                Events in Future State Prosecutions..................................................................12

        C.      Plaintiffs Will Not Have an Adequate Opportunity to Raise Their Claims
                or to Seek Appropriate Relief in Individual Misdemeanor Prosecutions ...........14

        D.      This Court Has Jurisdiction to Issue Declaratory Relief....................................16

III.    PLAINTIFFS STATE A CLAIM FOR DENIAL OF PROCEDURAL DUE
        PROCESS ..................................................................................................................17

        A.      Plaintiffs Have a Paramount Interest in Their Liberty.......................................19

        B.      Court Delay Makes the Right to Trial Functionally Meaningless and Poses
                an Unacceptably High Risk that Plaintiffs Will Be Wrongfully Deprived
                of Their Liberty................................................................................................19

        C.      Court Delay Serves No Government Interest......................................................20

IV.     PLAINTIFFS STATE A CLAIM FOR DENIAL OF THE RIGHT TO A
        SPEEDY TRIAL .......................................................................................................21

        A.      The Court May Consider Systemic Speedy Trial Violations ..............................21

        B.      Individualized Consideration of the Barker Factors Is Unnecessary for
                Allegations of Systemic Deprivations...............................................................23

V.      THE GOVERNOR IS A PROPER PARTY ...............................................................25

CONCLUSION..........................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aguilar v. ICE,*
811 F. Supp. 2d 803 (S.D.N.Y. 2011) ...............................................................................7, 9

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....................................................................................................4

*Barker v. Wingo,*
407 U.S. 514 (1972) ..................................................................................... 21, 23, 24

*Benjamin v. Fraser,*
264 F.3d 175 (2d Cir. 2001) ...................................................................................22

*Bennett v. United States,*
663 F.3d 71 (2d Cir. 2011) ......................................................................................23

*Biro v. Condé Nast,*
807 F.3d 541 (2d Cir. 2015), cert. denied, 136 S.Ct. 2015 (2016) .........................................5

*Branum v. Clark,*
927 F.2d 698 (2d Cir. 1991) .....................................................................................5

*Clapper v. Amnesty Int'l USA,*
133 S. Ct. 1138 (2013) ..............................................................................................9

*Colo. River Water Conservation Dist. v. United States,*
424 U.S. 800 (1976) ..................................................................................................10

*Cortlandt St. Recovery Corp. v. Hellas Telecommc'ns, S.a.r.l.,*
790 F.3d 411 (2d Cir. 2015) ................................................................................4, 5

*Courthouse News Serv. v. Planet,*
750 F.3d 776 (9th Cir. 2014) .................................................................................14

*Davis v. City of New York,*
902 F. Supp. 2d 405 (S.D.N.Y. 2012) ........................................................... 7, 8, 9

*Deshawn E. by Charlotte E. v. Safir,*
156 F.3d 340 (2d Cir. 1998) ................................................................................5, 6

*DiFolco v. MSNBC Cable L.L.C.,*
622 F.3d 104 (2d Cir. 2010) ....................................................................................4

*Duncan v. Louisiana*,
   391 U.S. 145 (1968) ...........................................................................................19

*Falco v. Justices of the Matrimonial Parts of Sup. Ct. of Suffolk Cnty.*,
   805 F.3d 425 (2d Cir. 2015), *cert. denied*, No. 15-1280, 2016 U.S. LEXIS 3786 (U.S.
   June 13, 2016) ...................................................................................................12

*Floyd v. City of New York*,
   283 F.R.D. 153 (S.D.N.Y. 2012) .......................................................................6, 9

*Harris v. Champion*,
   48 F.3d 1127 (10th Cir. 1995) ............................................................................22

*Irish Lesbian & Gay Org. v. Giuliani*,
   143 F.3d 638 (2d Cir. 1998) .................................................................................5

*Kapps v. Wing*,
   404 F.3d 105 (2d Cir. 2005) ...............................................................................18

*Kaufman v. Kaye*,
   466 F.3d 83 (2d Cir. 2006) ...........................................................................12, 13

*Klopfer v. North Carolina*,
   386 U.S. 213 (1967) ...........................................................................................24

*Kraebel v. New York City Dep't of Hous. Pres. & Dev.*,
   959 F.2d 395 (2d Cir. 1992) ...............................................................................20

*Krimstock v. Kelly*,
   306 F.3d 40 (2d Cir. 2002) .................................................................................20

*Kuck v. Danaher*,
   600 F.3d 159 (2d Cir. 2010) ...................................................................18, 20, 21

*Ligon v. City of New York*,
   925 F. Supp. 2d 478 (S.D.N.Y. 2013) ...............................................................6, 9

*Los Angeles County Bar Association v. Eu*,
   979 F.2d 697 (9th Cir. 1992) .......................................................... 13, 14, 16, 17

*Luckey v. Harris*,
   860 F.2d 1012 (11th Cir. 1988) ..........................................................................23

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .............................................................................................5

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000) .................................................................................4

ii

*Marisol A. by Forbes v. Giuliani*,
    929 F. Supp. 662 (S.D.N.Y. 1996) ................................................................15

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ........................................................................................18

*Mathis v. Bess*,
    138 F.R.D. 390 (S.D.N.Y. 1991) ..................................................................22

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
    457 U.S. 423 (1982) ........................................................................................11

*Mir v. Shah*,
    569 Fed. Appx. 48 (2d Cir. 2014) ................................................................12

*Moore v. Arizona*,
    414 U.S. 25 (1973) ..........................................................................................24

*N.Y. State Motor Truck Ass'n v. Pataki*,
    No. 03-CV-2386, 2004 WL 2937803 (S.D.N.Y. Dec. 17, 2004) (Daniels, J.) ......................25

*N.Y. Times Co. v. Gonzales*,
    459 F.3d 160 (2d Cir. 2006) ..........................................................................16

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
    491 U.S. 350 (1989) ("NOPSI") ..................................................................11

*Nicholson v. Williams*,
    203 F. Supp. 2d 153 (E.D.N.Y. 2002) ............................................. 15, 22, 23

*O'Connor v. Pierson*,
    426 F.3d 187 (2d Cir. 2005) ..........................................................................18

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ............................................................................ 7, 12, 13

*Owens v. Haas*,
    601 F.2d 1242 (2d Cir. 1979) ..........................................................................5

*Patel v. Searles*,
    305 F.3d 130 (2d Cir. 2002) ............................................................................5

*People United for Children, Inc. v. City of New York*,
    108 F. Supp. 2d 275 (S.D.N.Y. 2000) ..................................................... 14, 15

*Peters v. Neroni*,
    598 Fed. Appx. 797 (2d Cir. 2015) ..............................................................12

iii

*Phillip v. Univ. of Rochester*,
    316 F.3d 291 (2d Cir. 2003) ................................................................5

*Roe v. City of New York*,
    151 F. Supp. 2d 495 (S.D.N.Y. 2001) ...................................................7

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,
    547 U.S. 47 (2006) ..............................................................................5

*Shain v. Ellison*,
    356 F.3d 211 (2d Cir. 2004) ................................................................6

*Spinelli v. New York,*
    579 F.3d 160 (2d Cir. 2009) ..............................................................20

*Sprint Communications, Inc. v. Jacobs*,
    134 S. Ct. 584 (2013) ................................................... 10, 11, 12, 14

*Stauber v. City of New York*,
    No. 03-CV-9162 (RWS), 2004 WL 1593870 (S.D.N.Y. July 16, 2004) ...........................6, 9

*Strickland v. Washington*,
    466 U.S. 668 (1984) ..........................................................................22

*Thomas v. Cnty. of Los Angeles*,
    978 F.2d 504 (9th Cir. 1992) ..............................................................9

*Tinsley v. McKay*,
    No. CV-15-00185, 2015 WL 9690914-PHX-ROS (D. Ariz. Sept. 29, 2015) ...................12

*United States ex rel. Green v. Washington*,
    917 F. Supp. 1238 (N.D. Ill. 1996) ...................................................22

*United States v. Cronic*,
    466 U.S. 648 (1984) ..........................................................................22

*United States v. Marion*,
    404 U.S. 307 (1971) ..........................................................................19

*United States v. Vassell*,
    970 F.2d 1162 (2d Cir. 1992) ............................................................23

*United States v. Vespi*,
    545 F.2d 328 (2d Cir. 1976) ..............................................................23

*Velez v. Levy*,
    401 F.3d 75 (2d Cir. 2005) ................................................................18

iv

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
  549 F.3d 100 (2d Cir. 2008) ................................................................................4

*Wallace v. Kern*,
  481 F.2d 621 (2d Cir. 1973) ......................................................................... 12, 13

*Wallace v. Kern*,
  499 F.2d 1345 (2d Cir. 1974) ....................................................................... 12, 13

*Wallace v. Kern*,
  520 F.2d 400 (2d Cir. 1975) ......................................................................... 12, 13

*Younger v. Harris*,
  401 U.S. 37 (1971) ............................................................................................11

## OTHER AUTHORITIES

Wright, Miller & Kane, 10B FED. PRAC. & PROC. CIV. § 2759 (3d ed.).....................................16

v

**PRELIMINARY STATEMENT**

For years, persistent delays in the processing of misdemeanor cases, court congestion, and case backlogs (collectively, "Court Delay")[1] in New York City Criminal Court, Bronx County ("Bronx Criminal Court"), have created a system that routinely deprives thousands of people charged with misdemeanors of their constitutional rights.  As the *New York Times* noted more than three years ago, "[Bronx] courts are so dysfunctional that those accused of minor offenses—misdemeanors like trespassing or driving with a suspended license—have all but lost the fundamental guarantee of the American legal system: the right to a trial."  Compl. ¶ 129.  Defendants have been aware of the constitutional violations—indeed, they have repeatedly acknowledged them—and yet they have failed to remedy them.

Defendants ask the Court to avoid confronting this injustice.  They claim that Plaintiffs are the wrong people to bring this lawsuit, that this Court lacks jurisdiction because Plaintiffs' claims involve the state judiciary, and that the claims are invalid.  Defendants' arguments fail.  *First*, Plaintiffs have standing because they seek prospective relief and plausibly allege that they will likely be subjected to unconstitutional Court Delay.  *Second*, abstention is improper because Plaintiffs do not seek to restrain *ongoing* state criminal proceedings.  *Third*, Plaintiffs state valid claims for relief because Court Delay is so endemic that it corrupts every stage of a misdemeanor case in violation of due process, and because the delays associated with even the *average* misdemeanor case are sufficient to establish systemic Sixth Amendment violations.

What Defendants attempt to cast as "speculative," "intrusive," and somehow radical is, in fact, straightforward: providing forward-looking equitable relief to remedy unconstitutional state policies and practices that violate people's essential rights.

---

[1] All references to Court Delay are limited to misdemeanors in Bronx Criminal Court.

## FACTS[2]

The right to trial—and especially a speedy trial—is an illusion in Bronx Criminal Court. Court Delay has fatally undermined that right and the right to due process for the tens of thousands of people charged with low-level offenses in the Bronx each year. Bronx Criminal Court is paralyzed by a backlog of misdemeanor cases. In 2014, there were 50,703 new misdemeanors in the Bronx, significantly fewer than the number in Manhattan, Brooklyn, or Queens. Compl. ¶ 88. Yet, at the end of the year, the Bronx had 11,523 misdemeanor cases pending, more than any other borough. *Id.* In 2015, the number of new misdemeanors in the Bronx fell to 45,929, *id.* ¶ 89, but the number of *pending* misdemeanors climbed to 12,445. *Id.*

A disproportionate number of cases in the Bronx have been pending longer than the 90-day limit set by New York State Unified Court System (UCS) standards (the "UCS Standards"). *Id.* ¶ 5. In 2015, the average age of misdemeanor cases pending in the Bronx was 219 days; over 64% of cases exceeded the UCS Standards; and 19% of cases were more than 365 days old. *Id.* ¶ 92. 538 cases had been pending for more than two years. *Id.* Despite having fewer incoming misdemeanors than either Brooklyn or Manhattan, the Bronx consistently has more misdemeanors pending for more than one year than all other boroughs *combined*. *Id.* ¶¶ 11, 93.

In 2014, the time it took to resolve an average misdemeanor case in the Bronx was double the 90-day limit set by the UCS Standards. *Id.* ¶ 5. The trial statistics are even more dismal. In 2015, there were over 45,000 new misdemeanors in the Bronx but only 98 trials. *Id.* ¶ 6. More than 800 new misdemeanor cases enter the system weekly, but fewer than two go to trial. *Id.* The few people who manage to exercise their right to trial wait on average 642 days for a bench trial and 827 days for a jury trial. *Id.* ¶ 7. People charged with misdemeanors in the

---

[2] Plaintiffs respectfully refer the Court to the Complaint for a full recitation of the facts alleged.

Bronx must wait almost twice as long for a jury trial as people in Manhattan.  *Id.* ¶ 97.

Each week, there are hundreds of misdemeanor cases scheduled for trial in which both sides are ready to proceed.  *Id.* ¶ 6.  In the overwhelming majority of cases, however, there are no fully staffed courtrooms available to conduct the proceedings.  *Id.* ¶ 100.  The courtrooms often sit locked and empty for want of judges, clerks, court officers, or court reporters.  *Id.* ¶¶ 6, 99.  Only a small percentage of cases is actually sent to trial parts, and an even smaller percentage of cases actually proceeds to trial.  *Id.* ¶ 101.  The remaining "trial-ready" cases are adjourned, only to repeat the exercise weeks or months later.  *Id.*

Beyond the physical and psychological toll exacted by seemingly interminable delays, each postponement brings the potential for another missed day of work, lost wages, school absence, rescheduled medical appointment, financial hardship, or childcare emergency.  *Id.* ¶ 132.  Repeated absences from work can strain relationships with employers, and potential employers are less likely to hire people with pending criminal cases.  *Id.*  For those working in the public sector or in jobs requiring state licenses, an open case may lead to immediate suspension without pay and eventual termination.  *Id.* ¶ 133.

Defendants have been aware of these violations for years, but have failed to remedy them.  Since at least 2009, the Office of Court Administration has acknowledged the need to increase trial capacity in the Bronx.  Compl. ¶ 117.  In April 2013, former Chief Judge Jonathan Lippman publicly lamented the "glaring problems" in the Bronx associated with Court Delay that date back "as long as [he] can remember," and referred to Court Delay as "intolerable" and "entirely unacceptable."  *Id.* ¶ 120.  Later that year, the UCS acknowledged that "insufficient trial capacity, exacerbated by a shortage of judges . . .," was a key contributing factor to the problem.  *Id.* ¶ 121.  At the same time, the Governor pushed to decrease the judiciary's budget.

*Id.* ¶ 123.

The UCS repeatedly promised to address Court Delay, but repeatedly failed to do so. *Id.* ¶ 125. Most recently, in December 2013, the UCS announced a package of reforms to address the problem. *Id.* ¶ 126. Some reforms never materialized, and those that did failed to remedy the constitutional violations. *Id.* In 2015, despite a drop in the number of misdemeanor arraignments, the number of pending cases in Bronx Criminal Court increased. *Id.* ¶ 89.

Each of the Plaintiffs faces an imminent risk of arrest, prosecution, and unconstitutional Court Delay in the future. They bring this action to protect against those harms, for themselves and on behalf of members of the putative class.

## LEGAL STANDARD

On a Rule 12(b)(1) motion to dismiss, the court must determine whether it "lacks the statutory or constitutional power to adjudicate" the case. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Plaintiffs must only allege "facts that affirmatively and plausibly suggest that [they have] standing to sue." *Cortlandt St. Recovery Corp. v. Hellas Telecommc'ns, S.a.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015) (citation omitted). The Court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (citation and internal quotations omitted).

On a Rule 12(b)(6) motion, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must "accept all factual allegations as true and draw all reasonable inferences in the plaintiffs' favor." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d

Cir. 2010) (internal quotations and punctuation omitted).  "A claim is plausible 'when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.'"  *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir.

2015), cert. denied, 136 S.Ct. 2015 (2016) (quoting *Iqbal*, 556 U.S. at 678).[3]

## ARGUMENT

### I.   PLAINTIFFS HAVE STANDING BECAUSE THEY WILL LIKELY BE CHARGED WITH MISDEMEANORS IN BRONX CRIMINAL COURT

A motion to dismiss for lack of standing must be denied where, as here, the complaint

plausibly alleges facts suggesting that Plaintiffs have standing.  *See Cortlandt St.*, 790 F.3d at

417.  Though all named Plaintiffs have standing, only one must have standing for this case to

proceed.  *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).  Of the

requirements to establish standing, Defendants question only whether Plaintiffs have satisfied the

injury-in-fact requirement and whether they plausibly allege "a likelihood that [they] will be

injured in the future."  *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)

(citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983)).  Defendants do not dispute

that the injuries alleged here are fairly traceable to their conduct, or that those injuries can be

redressed by a favorable ruling.  *See Safir*, 156 F.3d *at 344*; *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560-61 (1992).

### A.   People Who Repeatedly Encountered a Policy in the Past and Are Likely to Encounter It Again Have Standing to Challenge Its Future Application

Despite Defendants' attempt to cast Plaintiffs' standing as speculative, the law is clear:

---

[3] The liberal standard for assessing pleading sufficiency under Fed. R. Civ. P. 8(a) must be applied "with particular strictness" where "the complaint alleges a civil rights violation." *Patel v. Searles*, 305 F.3d 130, 135 (2d Cir. 2002); s*ee also Phillip v. Univ. of Rochester*, 316 F.3d 291, 293-94 (2d Cir. 2003) ("liberal pleading rules apply with particular stringency to complaints of civil rights violations.") (citation omitted); *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998); *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991); *Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir. 1979).

someone who will likely be subjected to an unconstitutional policy in the future has standing to

seek forward-looking equitable relief.  And those who have repeatedly been subjected to a policy

in the past are especially likely to be subjected to it again in the future.  In *Deshawn E.*, a class of

children challenged the New York City Police Department (NYPD) policy of coercively

interrogating juveniles summoned to appear in Family Court.  156 F.3d at 342-43.  The children

had standing because they had been interrogated *in the past* and plausibly alleged that they were

likely to be interrogated again *in the future*.  *See id.* at 344.  Similarly, in *Ligon v. City of New*

*York*, residents of privately owned buildings patrolled by the NYPD challenged the NYPD policy

of stopping people outside those buildings without reasonable suspicion.  925 F. Supp. 2d 478,

484-85 (S.D.N.Y. 2013).  The named plaintiffs had standing because they frequented those

buildings, *had* been stopped multiple times outside those buildings in the past, and were "*likely*"

to be stopped again in the future.[4]  *Id.* at 522.

　　　Courts routinely apply these principles where plaintiffs who have repeatedly encountered

law enforcement challenge systematic law enforcement policies that will affect them in likely

future encounters.  For example, a man who was stopped and frisked four times was likely to be

stopped and frisked again and therefore had standing to enjoin the NYPD's "stop and frisk"

policy.  *See Floyd v. City of New York*, 283 F.R.D. 153, 169 (S.D.N.Y. 2012).  A woman who

attended three antiwar demonstrations while carrying a purse was likely to do so again and had

standing to enjoin a policy of searching protestors' bags.  *Stauber v. City of New York*, No. 03-

CV-9162 (RWS), 2004 WL 1593870, at *18 (S.D.N.Y. July 16, 2004).  Participants in a needle

exchange program who had previously been arrested had standing to enjoin a policy of harassing

---

[4] In contrast, an attorney with no prior criminal record who was once arrested and strip-searched in a Nassau County jail lacked standing to challenge the strip-search policy because he did not allege "the likelihood of a future encounter with the Nassau County police likely to result in a subsequent unconstitutional strip search."  *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004).

intravenous drug users in known drug areas.  *See Roe v. City of New York*, 151 F. Supp. 2d 495, 503-04 (S.D.N.Y. 2001).  And a family whose home was visited twice in thirteen months by immigration officers had standing to enjoin a policy of unconstitutional searches during immigration raids because their home was likely to be searched again.  *See Aguilar v. ICE*, 811 F. Supp. 2d 803, 827 (S.D.N.Y. 2011).  In short, "[t]he possibility of recurring [future] injury ceases to be speculative when actual repeated incidents are documented."  *Davis v. City of New York*, 902 F. Supp. 2d 405, 444 n.225 (S.D.N.Y. 2012) (citation and internal quotation omitted).

Defendants ignore this body of law applying well-established standing principles to analogous facts.  Citing *O'Shea v. Littleton*, 414 U.S. 488, 491-92 (1974), Defendants argue that a "theoretical sequence" of events ending in criminal prosecution cannot confer standing.  Ds' Mem. 10.  But Defendants ignore *why* the *O'Shea* plaintiffs lacked standing under the facts of that case: there was a complete "absence of allegations" that they would be charged with crimes in the future.  *O'Shea*, 414 U.S. at 496.  As the Court found, "The nature of [plaintiffs'] activities is not described in detail and no specific threats [of prosecution] are alleged to have been made against them."  *Id.* at 497.  Here, in contrast, Plaintiffs have candidly alleged *why* they will likely be charged with misdemeanors in Bronx Criminal Court.  Plaintiffs are regularly arrested for (low-level, nonviolent) unlawful conduct, *see, e.g.*, Compl. ¶¶ 73, 83, 86, or lawful conduct regularly misperceived as unlawful, *see id.* ¶¶ 72, 80.  As a result, they will likely again be arrested and charged with misdemeanors in Bronx Criminal Court.

**B.      Plaintiffs Allege that They Are Likely to Be Charged with Misdemeanors in Bronx Criminal Court**

Drawing all reasonable inferences in Plaintiffs' favor, as the Court must, the Complaint more than plausibly alleges that Plaintiffs are likely to be charged with misdemeanors in Bronx Criminal Court:

ny-1241737

- Christopher Trowbridge has struggled with heroin addiction for the past eighteen years and has spent multiple periods in detox and rehabilitation facilities. *Id.* ¶ 84. Mr. Trowbridge's addiction has led to multiple arrests and prosecutions, and he has been prosecuted in Bronx Criminal Court for substance-abuse related charges at least *six* times since 2008. *Id.* ¶ 85. Mr. Trowbridge continues to suffer from a long-term drug addiction and will likely be arrested and prosecuted for his illegal drug use in the Bronx again. *Id.* ¶ 86.

- Due to ongoing medical and psychiatric conditions, Juan Ortiz experiences episodes of severe disorientation. *Id.* ¶ 82. During these episodes, Mr. Ortiz compulsively takes items from stores without paying. *Id.* Between December 2012 and March 2015, Mr. Ortiz was arrested and prosecuted *fourteen* times in Bronx Criminal Court for the misdemeanors of petit larceny and/or possession of stolen goods. *Id.* Mr. Ortiz cannot control his behavior during these episodes and will likely be arrested and prosecuted in the Bronx again. *Id.* ¶ 83.

- Michael Torres works in the construction industry as a glazier, installing windows and aluminum panels on high-rise buildings. *Id.* ¶ 63. As part of his work, he uses a legal folding knife. *Id.* ¶ 72. People are regularly arrested and prosecuted in the Bronx for possessing such knives. *Id.* Mr. Torres was already wrongfully arrested and prosecuted for this offense once before. *Id.* Mr. Torres is also likely to be arrested and prosecuted for unlicensed driving. *Id.* ¶ 73. Mr. Torres has been unable to travel to Florida to clear a license suspension he received there. *Id.* Despite having a suspended license for the past six years, Mr. Torres has been required to drive to get to remote work sites not served by public transportation. *Id.* Mr. Torres has already been prosecuted for unlicensed driving *twice*. *Id.*

- Ronnie Pagan's girlfriend and their four children live in a New York City Housing Authority (NYCHA) apartment building in the South Bronx. *Id.* ¶ 80. Mr. Pagan regularly visits them. *Id.* Due to documented trespass enforcement practices in NYCHA buildings, Mr. Pagan is routinely stopped and—because his identification shows a Manhattan home address—has been repeatedly arrested for trespassing in his children's building. *Id.* Because Mr. Pagan continues to visit his girlfriend and their children in a Bronx NYCHA residence, he will likely be arrested and prosecuted again. *Id.*

In light of their life circumstances and their conduct, it is plainly plausible to infer that Plaintiffs will be arrested and prosecuted again in the Bronx. *See id.* ¶¶ 72-73, 80, 83, 86.

As discussed above, Plaintiffs' allegations of future prosecution are especially plausible in light of their histories of past prosecution. *See Davis*, 902 F. Supp. 2d at 444 n.225. Even as few as two past encounters with law enforcement suffice to establish a likelihood that similar

encounters will occur in the future.  *See, e.g.*, *Ligon*, 925 F. Supp. 2d at 522 (two stops); *Floyd*, 283 F.R.D. at 169 (four stops); *Aguilar*, 811 F. Supp. 2d at 827 (two searches); *Stauber*, 2004 WL 1593870, at *18 (three protests).  Moreover, Plaintiffs candidly acknowledge that they will continue to engage in similar behavior in the future.  *See* Compl. ¶¶ 73, 83, 86.

Contrary to Defendants' argument, there is no "attenuated chain of possibilities" between Plaintiffs' likely future conduct and their likely future prosecution in Bronx Criminal Court. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148 (2013); *see* Ds' Mem. 9-10.  The *Clapper* plaintiffs' claims rested on the remote and speculative possibility that the Government would attempt to intercept their communications with people outside the United States, would succeed, and would invoke a particular statute in doing so.  *See Clapper*, 133 S. Ct. at 1148.  Here, in contrast, Plaintiffs expressly allege that they regularly engage in low-level, nonviolent, unlawful conduct in the Bronx.  *See, e.g.*, Compl. ¶¶ 73, 82, 84.

Moreover, that Plaintiffs are Black and Latino men who engage in such conduct in the Bronx is not irrelevant to the standing inquiry.  Compl. ¶¶ 63-86.  Courts have found support for standing where policies and practices disproportionately impact or target specific communities. *See, e.g., Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 507-08 (9th Cir. 1992) (plaintiffs had standing where, *inter alia*, alleged police misconduct targeted people in a specific geographic area); *Floyd*, 283 F.R.D. at 169-70; *Ligon*, 925 F. Supp. 2d at 522; *Davis*, 902 F. Supp. 2d at 444-45.  Here, "the disproportionate number of Blacks and Latinos, as compared to Whites, who become entangled in the criminal justice system[]" in New York City is well documented and has been recognized by courts in this district.  *Floyd*, 283 F.R.D. at 159-60 (discussing "extensively documented racial disparities in the rates of stops, arrests, convictions, and sentences . . . ."); *see also* Compl. ¶ 10 ("in Bronx Criminal Court, people of color make up 95%

9

of all misdemeanor arraignments . . . .").  The heightened risk of arrest and prosecution for Black

and Latino men further confirms the plausibility of Plaintiffs' claims that they are likely to be

arrested and prosecuted in Bronx Criminal Court in the future.

How long it takes to resolve Plaintiffs' future cases is immaterial.  *Cf.* Ds' Mem. 9-10.

Plaintiffs allege that anyone forced to defend themselves in a fundamentally unfair system with

no meaningful opportunity to promptly dispute the charges or challenge the government's proof

suffers constitutional injury.  *See* Compl. ¶¶ 9, 19, 87-103, 138-39.  Court Delay makes trials,

and especially speedy trials, illusory for everybody.  No one has a meaningful, timely

opportunity to defend his liberty.  In response, many people plead guilty to avoid the enormous

costs of returning to court for months or years.  Having plausibly alleged that they will likely be

prosecuted on misdemeanor charges in Bronx Criminal Court, plaintiffs have standing to bring

these claims challenging unconstitutional Court Delay.

## II.   ABSTENTION IS IMPROPER BECAUSE PLAINTIFFS' CLAIMS DO NOT PRESENT "EXCEPTIONAL CIRCUMSTANCES" WARRANTING THE ABDICATION OF FEDERAL JURISDICTION

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction

given them."  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)

(citations omitted).  Defendants urge this Court to abdicate a core function—adjudicating

constitutional questions on the merits—while ignoring the Supreme Court's recent restatement of

its abstention jurisprudence in *Sprint Communications, Inc. v. Jacobs*, 134 S. Ct. 584 (2013).

The omission is striking.  As *Sprint* makes clear, the circumstances under which federal courts

may abstain from exercising jurisdiction are rare and highly circumscribed, and none is present

here.  *See Sprint*, 134 S. Ct. at 588. Because none of the Plaintiffs has a pending criminal

prosecution, and because Plaintiffs do not seek relief that would require this Court to restrain or

control any pending prosecution now or in the future, Defendants' arguments fail.

10

A.      **The Categorical Approach to Abstention Enunciated in *Sprint* Fatally Undermines Defendants' Reading of *Younger***

The interpretation of the abstention doctrine advanced by Defendants is both overbroad and directly contradicted by the Supreme Court's decision in *Sprint* and subsequent Second Circuit case law.  In *Sprint*, the Court clarified its categorical approach to abstention, limiting application of abstention under *Younger v. Harris*, 401 U.S. 37 (1971) to the three threshold "exceptional circumstances" first enumerated in *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350 (1989) ("NOPSI"): (1) "parallel, pending state criminal proceeding[s]"; (2) ongoing civil enforcement proceedings; and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 134 S. Ct. at 588 (quotation omitted); *see also id.* at 587 ("*Younger* extends to the three 'exceptional circumstances' identified in *NOPSI*, but no further.").  Outside these three "exceptional" categories, abstention is improper.  *Id.* at 592.[5]

The logic underlying Defendants' arguments was firmly rejected in *Sprint*.  While federalism and comity concerns may, broadly speaking, inform federal courts' decision-making whenever federal litigation implicates state court proceedings—such as in the crafting of remedies—the blunt tool of abstention is reserved for "exceptional circumstances" presenting the narrow, specific, and unique evil the Court sought to avoid in *Younger* itself: restraint of *ongoing* state criminal proceedings.  *Younger,* 401 U.S. at 39, 43-44 (abstention appropriate where plaintiff sought federal injunction restraining his ongoing individual state criminal prosecution based on constitutional challenge to underlying criminal statute).  As the Second Circuit's post-

---

[5] Specifically, the Court clarified that the three-part test derived from *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982) that was previously applied in the Second Circuit only applies if the court has first established that the case falls squarely into one of the *NOPSI* categories.  *Sprint*, 134 S. Ct. at 587 ("The three *Middlesex* conditions . . . were not dispositive; they were, instead, *additional* factors appropriately considered by the federal court before invoking *Younger*." (emphasis in original)).

*Sprint* cases make clear, the threshold question is whether there is an ongoing parallel state criminal proceeding. *See Falco v. Justices of the Matrimonial Parts of Sup. Ct. of Suffolk Cnty.,* 805 F.3d 425, 427 (2d Cir. 2015) (district court erred in failing to adhere to "the straightforward categorical approach required by *Sprint*."), *cert. denied*, No. 15-1280, 2016 U.S. LEXIS 3786 (U.S. June 13, 2016); *Mir v. Shah*, 569 Fed. Appx. 48 (2d Cir. 2014) (Second Circuit's pre-*Sprint* "important state interest" formulation has been replaced by *Sprint*'s categorical approach); *Peters v. Neroni*, 598 Fed. Appx. 797, 798 (2d Cir. 2015) (same). Where, as here, the answer is "no," abstention is improper.

### B.   Plaintiffs Do Not Seek an Injunction Controlling the Outcome of Specific Events in Future State Prosecutions

Defendants urge this Court to abstain under *O'Shea v. Littleton*, 414 U.S. 488, *Wallace v. Kern*, 481 F.2d 621 (2d Cir. 1973) (*Wallace I*), *Wallace v. Kern*, 499 F.2d 1345 (2d Cir. 1974) (*Wallace II*), *Wallace v. Kern*, 520 F.2d 400 (2d Cir. 1975) (*Wallace III*) (collectively, "*Wallace Cases*"), and *Kaufman v. Kaye*, 466 F.3d 83 (2d Cir. 2006). *O'Shea* abstention, however, is not a standalone doctrine, but merely a variation of *Younger*. *See O'Shea*, 414 U.S. at 499, 500; *see also Tinsley v. McKay*, No. CV-15-00185, 2015 WL 9690914-PHX-ROS, at *15 (D. Ariz. Sept. 29, 2015) ("*O'Shea* abstention is an outgrowth of *Younger*."). As *Sprint* makes plain, the expansive reading of *Younger* reflected in *O'Shea* and its Second Circuit progeny is no longer viable. *See Sprint*, 134 S. Ct. at 591 (*NOPSI* categories "define *Younger*'s scope"). Defendants do not, and cannot, cite any post-*Sprint* case to support their overly broad view of *O'Shea* because no such case exists.

Even under the overly expansive reading of *Younger* put forward by Defendants, *O'Shea*, the *Wallace Cases*, and *Kaufman* do not mandate abstention. Each of these cases involved an injunction that would have had federal courts create, implement, and enforce new rules that

would determine substantive and procedural outcomes in individual ongoing cases. *See O'Shea*, 414 U.S. at 491-92 (order enjoining bond-setting, sentencing, and jury-fee practices); *Wallace I*, 481 F.2d at 622 (injunction against public defender's acceptance of additional cases and order to calendar *pro se* motions); *Wallace II*, 499 F.2d at 1351 (order creating new procedural rights for pretrial detainees held in custody for over six months); *Wallace III*, 520 F.2d at 403 (injunction mandating new bail procedures); *Kaufman*, 466 F.3d at 85 (injunction that would have determined how cases were assigned among panels of judges in appellate court). No such relief is sought here.

Contrary to Defendants' assertions, Plaintiffs do not seek relief that would determine the outcome of any procedural or substantive decision in any individual misdemeanor case, or that would require a federal "audit" or "piecemeal interruptions of . . . state proceedings by litigation in the federal courts . . . ." *See O'Shea*, 414 U.S. at 500. They ask this Court neither to "establish rules of practice for the state courts . . ." *Wallace II*, 499 F.2d at 1351, nor to "legislate and engraft new procedures upon existing state criminal practices . . . ." *Wallace III*, 520 F.2d at 404.

Plaintiffs' claims stem not from the application or misapplication of substantive or procedural rules, but from the lack of structural capacity, massive case backlogs, and constitutionally deficient allocation of court resources. Indeed, a central part of the problem is that Court Delay disables the orderly and regular application of procedural rules put in place to ensure due process and speedy trial rights, such as New York's statutory speedy trial law. *See* Compl. ¶ 111-115. Federal court intervention here would not "disrupt the normal course of proceedings . . .;" it would enable it. *O'Shea*, 414 U.S. at 501.

This case finds a more direct analogue in *Los Angeles County Bar Association v. Eu*, 979

F.2d 697 (9th Cir. 1992).  There, plaintiffs sought a declaratory judgment that a California law setting the number of judgeships in Los Angeles County violated both the state and federal constitutions by causing significant delays in the resolution of civil cases.  *Id.* at 700.  The Ninth Circuit held that the exercise of jurisdiction was proper even though the relief sought would "inevitably require restructuring" of the court system.  *Id.* at 703-04; *see also id.* at 704 (noting that plaintiffs' focus on "average court delays rather than the delay in any specific case" favored the exercise of jurisdiction); *Courthouse News Serv. v. Planet*, 750 F.3d 776, 792 (9th Cir. 2014) ("[T]hat *some* additional litigation may later arise to enforce an injunction does not itself justify abstaining from deciding a constitutional claim.").  In *Courthouse News*, the Ninth Circuit adhered to this distinction and found that the plaintiff's request for an injunction to reform the state court's allegedly unconstitutional practices did not warrant abstention because there were various ways the government could comply without requiring the district court to meddle in individual cases.  750 F.3d at 791. The same is true here.

### C.     Plaintiffs Will Not Have an Adequate Opportunity to Raise Their Claims or to Seek Appropriate Relief in Individual Misdemeanor Prosecutions

Plaintiffs will have no meaningful or adequate opportunity to raise their constitutional claims in future misdemeanor prosecutions or, more importantly, to obtain system-wide equitable relief.  Even if the ability to raise federal claims in a future state court proceeding were a bar to the exercise of federal jurisdiction—which it is not, s*ee Sprint*, 134 S. Ct. at 588—there is not, in fact, an adequate opportunity to raise claims alleging systemic violations of federal constitutional law in an individual misdemeanor case.  For precisely this reason, "abstention in civil rights cases brought under § 1983 is particularly disfavored because such cases are meant to redress inadequate state law remedies." *People United for Children, Inc. v. City of New York*, 108 F. Supp. 2d 275, 288 (S.D.N.Y. 2000) (citation omitted); *see also id.* at 291 (finding that

Family Court could not "adequately consider plaintiffs' claims in the context of a multi-faceted lawsuit challenging a system-wide policy rather than . . . actions in individual cases.").

Plaintiffs bring this suit on behalf of a putative class of thousands of people who will be subjected to a criminal court incapable of ensuring basic constitutional rights. Their claims implicate the allocation of judicial and other court resources across a court system that processes tens of thousands of misdemeanor cases per year. That Plaintiffs may be able to raise individual constitutional speedy trial claims in future prosecutions does not make Bronx Criminal Court a suitable forum for Plaintiffs to litigate their claims or to obtain a remedy for systemic constitutional violations. *Cf. id.* at 290 ("Although the Court agrees that plaintiffs can make constitutional arguments in the Family Court, the Court does not agree that child neglect proceedings afford plaintiffs an adequate opportunity to raise their present claims."). Plaintiffs would not be able to request declaratory relief or an injunction to remedy the systemic violations. *See id.* at 286-87 (abstention inappropriate where plaintiffs sought declaratory relief and an injunction that could not be granted by Family Court); *see also Nicholson v. Williams*, 203 F. Supp. 2d 153, 229-32 (E.D.N.Y. 2002); *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 688 (S.D.N.Y. 1996).

Defendants fundamentally misconstrue the core of Plaintiffs' Complaint. Plaintiffs seek prospective relief because they face the imminent threat of being subjected to a criminal justice system incapable of providing meaningful process within a meaningful amount of time consistent with the Constitution. The violation manifests as soon as a person is arraigned and has to make decisions about proceeding in a system tainted by unconstitutional Court Delay. Waiting for a constitutional speedy trial claim to "ripen" in an individual criminal case is not an adequate remedy to address these concerns.

### D.       This Court Has Jurisdiction to Issue Declaratory Relief

Courts must consider five factors when entertaining a declaratory judgment action:

> (i) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (ii) whether a judgment would finalize the controversy and offer relief from uncertainty; (iii) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (iv) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy.

*N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d Cir. 2006) (internal quotations and citations omitted).  The factors weigh in favor of the exercise of jurisdiction here.

Because declaratory relief would clarify and shift the burden to remedy Court Delay to the parties with the power to do so, the first two factors weigh in favor of a simple declaration of rights and liability.  The Ninth Circuit reached a nearly identical conclusion in *Los Angeles County Bar Association*.  There, the Court reasoned that a declaration that the California statute setting the number of judgeships in Los Angeles County led to unconstitutional delays in pending civil cases would shift the burden of fixing the problem to the policymakers in a position to implement a solution.  *Los Angeles Cnty. Bar Ass'n*, 979 F.2d at 701 (plaintiff "adequately demonstrated that . . . it is likely that the alleged injury would be to some extent ameliorated.").  Here, unconstitutional Court Delay has persisted for years, despite widespread acknowledgment of the problem.  Declaratory relief would force the Defendants to devote the appropriate resources to remedying the underlying structural and administrative problems.

The fourth factor[6] largely mirrors the considerations driving the Court's abstention analysis.  *See* Wright, Miller & Kane, 10B FED. PRAC. & PROC. CIV. § 2759 (3d ed.).  And, as in the abstention context, the mere fact that Plaintiffs' claims implicate the administration of the

---

[6] The third factor is not relevant here.

Bronx courts does not make the exercise of declaratory jurisdiction improper.  Plaintiffs do not ask this Court to intervene in "hypothetical prosecutions."  Ds' Mem. 17.  Instead, they seek a declaration that Defendants' acts, practices, policies, and/or omissions lead to violations of Plaintiffs' and putative class members' Sixth and Fourteenth Amendment rights on a system-wide basis.  *See Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d at 704 (declaratory jurisdiction appropriate where plaintiff chose "to frame its challenge as, in effect, a facial one, citing average court delays rather than the delay in any specific case as unconstitutional.").  The Ninth Circuit confronted precisely this issue in *Los Angeles County Bar Association*, ultimately finding that the exercise of declaratory jurisdiction was proper, because "the relief sought . . . would not directly require supervision of the state court system by federal judges," even though it "would inevitably require restructuring of that system."  *Id.* at 703.  Because Plaintiffs do not seek relief that would dictate the outcomes of substantive or procedural decisions by judges in their judicial capacities, declaratory relief would not "improperly encroach" on the judicial function of the state courts.

Finally, the fifth factor weighs heavily in favor of Plaintiffs.  Plaintiffs and putative class members will not have an adequate opportunity to challenge systemic Court Delay or to request the type of declaratory and injunctive relief they seek here in the context of individual misdemeanor cases in Bronx Criminal Court.  Moreover, Defendants' failure to remedy persistent unconstitutional Court Delay, despite notice of the depth of the problem for many years, makes the need for the instant litigation clear and demonstrates that there is no "better or more effective remedy" available to Plaintiffs.

## III.   PLAINTIFFS STATE A CLAIM FOR DENIAL OF PROCEDURAL DUE PROCESS

Defendants fundamentally misunderstand the nature of Plaintiffs' due process claims.  Plaintiffs allege violations of their *procedural*, not substantive, due process rights.  *See* Compl. ¶

17

139 (alleging violations of "due process right to have a trial at a meaningful time and in a meaningful manner . . . ."). Defendants, however, do not even address Plaintiffs' procedural due process claims. Instead, they cite to a pair of cases that stand for the proposition that *substantive* due process claims may not lie where a particular constitutional amendment provides explicit textual support for the right asserted. *See* D's Mem. 24-25 (citing *Albright v. Oliver*, 510 U.S. 266 (1994); *Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005)). These cases are inapplicable here.

Plaintiffs allege that misdemeanor proceedings in Bronx Criminal Court are fundamentally unfair and seek *prospective* relief to prevent future constitutional violations. Plaintiffs do not seek redress for past violations of their rights. Instead, they claim that because trials are functionally unattainable in Bronx Criminal Court, Defendants' policy and practice of Court Delay renders meaningless the entire process by which people charged with misdemeanors are supposed to defend and regain their liberty, *see Kuck v. Danaher*, 600 F.3d 159, 163 (2d Cir. 2010), systematically violating the right "to be heard at a meaningful time and in a meaningful manner," *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (citation omitted). Plaintiffs have sufficiently pled both that they have a constitutionally protected liberty interest and that Court Delay renders the existing procedures for protecting that interest inadequate under the Fourteenth Amendment. *See Kapps v. Wing*, 404 F.3d 105, 112 (2d Cir. 2005); *O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005); *see also Mathews*, 424 U.S. at 333 ("the opportunity to be heard at a meaningful time and in a meaningful manner" is the "fundamental requirement of due process") (citation omitted). "Their allegations form a cognizable claim under the three-factor *Mathews* test, which considers: (1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value (if any) of alternative procedures; and (3) the government's interest . . . ." *See O'Connor*, 426 F.3d at 197.

18

### A.      Plaintiffs Have a Paramount Interest in Their Liberty

Whenever a person is subjected to criminal prosecution, his liberty is at jeopardy.  *See Duncan v. Louisiana*, 391 U.S. 145, 151 (1968) (jury trial forms a "barrier . . . between the liberties of the people and the prerogative of the [state]") (quoting 4 W. Blackstone, Commentaries *349-50).  That liberty interest carries through the entire criminal process.  The time during which a criminal defendant stands accused but untried "may seriously interfere with [his] liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends."  *United States v. Marion*, 404 U.S. 307, 320 (1971).  Because Court Delay taints the entire criminal process, there can be little question that Plaintiffs have pled a substantial liberty interest.

### B.      Court Delay Makes the Right to Trial Functionally Meaningless and Poses an Unacceptably High Risk that Plaintiffs Will Be Wrongfully Deprived of Their Liberty

Court Delay makes trials functionally unattainable for thousands of people charged with misdemeanors in the Bronx every year.  People seeking trials are forced to return to court time and time again—often for months, if not years, and often for multiple futile "trial" dates—only to be told to come back another day, because no Trial Parts are available.  Compl. ¶¶ 2-6.  The few people who manage to exercise their right to trial in misdemeanor cases wait on average 642 days for a non-jury bench trial and an astonishing 827 days for a jury trial.  *Id.* ¶ 7.  They face systemic deprivations of their liberty while they wait, experiencing daily disruptions to their lives and sometimes more severe consequences, such as the loss of a job, or even an opportunity to attain legal immigration status.  Compl. ¶¶ 46-48; 61-62; 69-71; 132-136.  Court Delay corrupts every stage of a misdemeanor case, and many plead guilty just to put an end to the mounting costs.  In short, Court Delay makes trial procedures in Bronx Criminal Court "'inadequate to the

point that they are meaningless or nonexistent.'" *Kuck*, 600 F.3d at 163 (quoting *Gyadu v. Workers' Comp. Comm'n*, 129 F.3d 113 (2d Cir. 1997) (internal quotation omitted)).

The Second Circuit has allowed due process claims based on similar allegations to proceed past a motion to dismiss.  In *Kuck*, the Second Circuit reversed a district court's dismissal of a suit claiming procedural due process violations arising from undue administrative agency delay where the plaintiff filed a putative class action, contending "that the eighteen-month period he waited to receive an appeal hearing before the Board [of Firearms Review Examiners] was, in light of the liberty interest at stake, excessive and unwarranted, and thus violated due process."  600 F.3d at 163; *see also Kraebel v. New York City Dep't of Hous. Pres. & Dev.*, 959 F.2d 395, 405 (2d Cir. 1992) (reversing dismissal of procedural due process claim in case involving delays in certain payments to landlord per governmental program).

Similarly, in *Krimstock v. Kelly*, the Second Circuit reversed the trial court's dismissal of a class action where plaintiffs—car owners whose vehicles were seized by New York City—alleged due process violations because they "often" had to wait a year or more to contest the seizure.  306 F.3d 40, 53 (2d Cir. 2002) ("to say that the forfeiture proceeding, which often occurs more than a year after a vehicle's seizure, represents a meaningful opportunity to be heard at a meaningful time on the issue of continued impoundment is to stretch the sense of that venerable phrase to the breaking point."); *see also Spinelli v. New York,* 579 F.3d 160, 174 (2d Cir. 2009) (gun dealer whose license had been suspended and inventory confiscated entitled to summary judgment on due process claim after 58-day wait to regain her license and inventory).

### C.    Court Delay Serves No Government Interest

Defendants fail to identify an interest in maintaining the status quo.  To the contrary, the former Chief Judge called Court Delay "unacceptable" and "intolerable."  *See* Compl. ¶¶ 119-120, 127-128.  Nor may Defendants justify the profound delays in bringing misdemeanor cases

to trial as merely the result of the Bronx Criminal Court's caseload and backlog. *See Kuck*, 600

F.3d at 166 (rejecting state's argument that prolonged waits for hearings are "simply a function

of the [tribunal's] caseload and backlog."). "For the purposes of a due process analysis, the state

must articulate some reason, tied to [its] interest [in the challenged procedures], that justifies" the

delay at issue. *Kuck*, 600 F.3d at 166. Defendants cannot do so here. Under clear Second

Circuit precedent, Plaintiffs sufficiently state a procedural due process claim, and Defendants

have failed to carry their burden to show that the claim should be dismissed.

## IV.   PLAINTIFFS STATE A CLAIM FOR DENIAL OF THE RIGHT TO A SPEEDY TRIAL

Contrary to Defendants' assertions, Plaintiffs do not seek redress for past constitutional

violations of their speedy trial rights. Ds' Mem. 21-22, n.7 (faulting named Plaintiffs for not

specifying exactly how many days their own trials were delayed). Rather, they seek prospective

relief to prevent speedy trial violations in the future. Because the average delays associated with

misdemeanor cases in Bronx Criminal Court are so extreme, prejudicial, and unjustified,

Plaintiffs properly assert systemic violations of their speedy trial rights.

### A.   The Court May Consider Systemic Speedy Trial Violations

Defendants erroneously assert that because speedy trial claims usually require case-by-

case analysis, *see Barker v. Wingo,* 407 U.S. 514, 530 (1972), this Court is powerless to address

Bronx Criminal Court's entrenched, standard practice of routinely imposing grossly excessive

trial delays on thousands of people each year that deny their Sixth Amendment right to "a speedy

and public trial." Defendants' reliance on two sentences from an opinion issued more than forty

years ago is misplaced. *See* Ds' Mem. 21-22 (quoting *Wallace III*, 520 F.2d at 404 ("Relief from

unconstitutional delays in criminal trials is not available in wholesale lots. Whether an individual

has been denied his rights to a speedy trial must be determined ad hoc on a case-by-case basis.")

21

(citation omitted)).  Where, as here, "the state imposes systemic barriers to [the exercise of Sixth Amendment rights], prospective injunctive relief without individualized proof of injury is necessary and appropriate."  *Nicholson v. Williams,* 203 F. Supp. 2d at 240.

This principle has been most fully developed in the context of the right to effective assistance of counsel.  A criminal defendant alleging ineffective assistance of counsel usually must make an individualized showing that counsel's performance was inadequate and that prejudice resulted.  *See Strickland v. Washington*, 466 U.S. 668, 692 (1984).  The Supreme Court, however, has recognized that "[i]n certain Sixth Amendment contexts, prejudice is presumed. . . .  Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost."  *Id.*; *see also United States v. Cronic*, 466 U.S. 648, 658 (1984).  Following this principle, the court in *Nicholson* determined that the government defendants "systematically deprive[d] indigents of effective counsel," *Nicholson*, 203 F. Supp. 2d at 256, by creating a system of assigned counsel that was "largely a sham."  *Id.* at 253; *see also Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001) (upholding class-wide injunction against practices interfering with attorney visits to prisoners with no individual showing of "actual injury").  Courts have also dispensed with individualized analysis in cases involving systemic delays in criminal appeals.  *See United States ex rel. Green v. Washington*, 917 F. Supp. 1238, 1277-78 (N.D. Ill. 1996) (finding presumption of prejudice in due process context where "chronic and systemic" delays caused "wholesale denial of the right to a reasonably timely appeal" to class of habeas petitioners); *see also Harris v. Champion*, 48 F.3d 1127, 1132 (10th Cir. 1995); *Mathis v. Bess*, 138 F.R.D. 390, 397 (S.D.N.Y. 1991) (certifying class of indigent appellants challenging appellate delay under 42 U.S.C § 1983).  "Where a class of litigants are systematically deprived of constitutional rights by well-defined state practice, relying on retrospective, individualized

relief is wasteful of judicial resources and harmful to the aggrieved parties."  *Nicholson*, 203 F.

Supp. 2d at 255; *see also Luckey v. Harris*, 860 F.2d 1012, 1018 (11th Cir. 1988) (class of

indigent defendants stated valid Sixth Amendment claim alleging "systemic delays in the

appointment of counsel").  The *Nicholson* analysis applies with equal force here.

> **B.     Individualized Consideration of the *Barker* Factors Is Unnecessary for Allegations of Systemic Deprivations**

Like the test for ineffective assistance of counsel, *Barker*'s four-factor test for evaluating

Sixth Amendment speedy trial claims directs courts to evaluate the prejudice suffered by the

accused.  *Compare Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (describing

*Strickland*'s performance and prejudice prongs), *with Barker*, 407 U.S. at 530 (courts must

consider "[l]ength of delay, the reasons for the delay, the defendant's assertion of his rights, and

prejudice to the defendant.").  And, as with ineffective assistance of counsel, where there are

systemic barriers to the exercise of the right to a speedy trial, individualized analysis and relief

are unnecessary.

The delays suffered by people in Bronx Criminal Court easily meet *Barker*'s threshold of

being "presumptively prejudicial."  *Barker*, 407 U.S. at 530.  Waits for trial *average* one year

and nine months for a bench trial and two years and three months for a jury trial, Compl. ¶ 97—

double and triple, respectively, the eight months that the Second Circuit has suggested is

"presumptively prejudicial" for speedy trial purposes.  *See United States v. Vassell*, 970 F.2d

1162, 1164 (2d Cir. 1992).  The delays are all the more egregious considering that they are

imposed on misdemeanor defendants.  *See Barker*, 407 U.S. at 531 ("the delay that can be

tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy

charge."); *see also United States v. Vespi*, 545 F.2d 328, 333 (2d Cir. 1976) (granting speedy trial

relief where defendant waited 20 months for trial on "simple and uncomplicated" charges and

where the trial involved "few witnesses" and "lasted only 7 ½ hours").  The structural impediments to the exercise of the right to a speedy trial are simply so great in Bronx Criminal Court that prejudice may be presumed.

The prejudice, however, is not merely presumptive.  Delays of the magnitude and scope of those faced by people charged with misdemeanors in the Bronx exact a significant "physical and psychological toll" and result in work and school absences, lost wages, lost jobs, disruptions to work and family life, ineligibility for state licenses, and damage to employment prospects. Compl. ¶¶ 132-136.  These are exactly the types of prejudice that the speedy trial right is supposed to protect against.  *See Moore v. Arizona*, 414 U.S. 25, 26-27 (1973) (quoting *United States v. Marion*, 404 U.S. 307, 320 (1971)).  When the Supreme Court extended the Sixth Amendment speedy trial obligation to the states, it recognized these interests as paramount:

> The pendency of the indictment may subject [the defendant] to public scorn and deprive him of employment, and almost certainly will force curtailment of his speech, associations and participation in unpopular causes. . . . [I]ndefinitely prolonging this oppression, as well as the anxiety and concern accompanying public accusation . . . clearly denies the [defendant] the right to a speedy trial . . . guaranteed to him by the Sixth Amendment. . . .

*Klopfer v. North Carolina*, 386 U.S. 213, 222 (1967) (internal citation and quotations omitted).

The reasons for these delays further weight the *Barker* analysis in Plaintiffs' favor.  As Justice White explained in his concurrence in *Barker*, "crowded dockets and prosecutorial case loads" are constitutionally inadequate reasons to deny a speedy trial; "unreasonable delay in run-of-the-mill criminal cases cannot be justified by simply asserting that the public resources provided by the State's criminal justice system are limited and that each case must await its turn." *Barker*, 407 U.S. at 537-38 (White, J., concurring).  Because Plaintiffs allege that they and putative class members face structural impediments to the exercise of their right to a speedy trial, their Sixth Amendment claims must proceed.

## V.      THE GOVERNOR IS A PROPER PARTY

Citing cases involving the constitutionality of statutes, Defendants assert that the Governor cannot be named as a defendant merely by virtue of his status as New York's chief law enforcement officer.  *See* Ds' Mem. 25.  That is correct in a different context, but irrelevant to this case.  Plaintiffs allege that Governor Cuomo, acting in his official capacity, is *personally responsible* for failing to provide the UCS with adequate funding to satisfy the State's basic constitutional responsibilities; he has even publicly boasted about the same.  *See* Compl. ¶¶ 123, 125 & n.31.  The Complaint also alleges that the Governor is personally aware of Court Delay, which has been thoroughly discussed in official documents and in the media.  *See id.* ¶¶ 116-122 & nn.19-30, 129-130 & n.38.  This is not a case in which Plaintiffs have failed to allege that the Governor has "any connection" to Court Delay beyond his "general duty to ensure the laws are faithfully executed."  *N.Y. State Motor Truck Ass'n v. Pataki*, No. 03-CV-2386, 2004 WL 2937803, at *12 (S.D.N.Y. Dec. 17, 2004) (Daniels, J.).  To the contrary, Plaintiffs have plausibly alleged that Governor Cuomo is aware of pervasive Court Delay in Bronx Criminal Court; has tolerated Court Delay by doing nothing to address it; and has directly contributed to the problem by depriving the courts of needed resources.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss.

ny-1241737

Dated:        July 29, 2016
              Bronx, New York

                              THE BRONX DEFENDERS

                              By: /s/ Scott D. Levy

                              Johanna B. Steinberg
                              Scott D. Levy
                              360 East 161st Street
                              Bronx, NY 10451
                              (718) 838-7878
                              johannas@bronxdefenders.org
                              scottl@bronxdefenders.org

                              EMERY CELLI BRINCKERHOFF &
                              ABADY LLP

                              Matthew D. Brinckerhoff
                              Ilann M. Maazel
                              Douglas E. Lieb
                              600 Fifth Avenue, 10th Floor
                              New York, NY 10020
                              (212) 763-5000
                              mbrinckerhoff@ecbalaw.com
                              imaazel@ecbalaw.com
                              dlieb@ecbalaw.com

                              MORRISON & FOERSTER LLP

                              Gary S. Lee
                              Ruti Smithline
                              Jennifer K. Brown
                              Katie L. Viggiani
                              James A. Newton
                              250 West 55th Street
                              New York, NY 10019
                              (212) 468-8000
                              glee@mofo.com
                              rsmithline@mofo.com
                              jbrown@mofo.com
                              kviggiani@mofo.com
                              jnewton@mofo.com

26