UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER TROWBRIDGE, MICHAEL TORRES, RONNIE PAGAN, JUAN ORTIZ, LUIS VIRELLA, JASON GARCIA, and JOSEPH JOSHUA, individually and on behalf of a class of all others similarly situated; | Civil Action No. 16-cv-3455 (GBD) |
| Plaintiffs, | **AMENDED COMPLAINT** |
| – against – | **[CLASS ACTION]** |
| JANET DIFIORE, in her official capacity as Chief Judge of the State of New York and Chief Judicial Officer of the Unified Court System; and LAWRENCE MARKS, in his official capacity as Chief Administrative Judge of the Unified Court System; | |
| Defendants. | |

PRELIMINARY STATEMENT

1.      Justice delayed is justice denied.  The constitutional right to a trial—a speedy and public trial—is the foundation of our adversarial criminal justice system.  The right to challenge the state's evidence and confront witnesses in a meaningful and timely manner gives legal and moral legitimacy to the system as a whole.  For people accused of misdemeanors in the Bronx, however, this right is illusory.[1]  Years of persistent delays in processing misdemeanor cases, court congestion, and case backlogs (collectively, "Court Delay") in the New York City Criminal Court, Bronx County ("Bronx Criminal Court") have fatally undermined the right to trial and the

---

[1] For the purposes of this Complaint, the use of the term "misdemeanors" is intended to include all misdemeanors as well as non-criminal violations and infractions.

right to a speedy trial for the tens of thousands of people charged with low-level offenses in the Bronx.  The system more closely resembles punishment than due process.

2.      Each day, hundreds of people arrive at Bronx Criminal Court to wait for their day in court.  Appearances are not scheduled for a particular hour or window of time, so everyone has to arrive at the beginning of the day.  Arrest warrants may be issued for latecomers.  People sit in packed courtrooms for hours—sometimes all day—waiting for their cases to be called.  They take the entire day off of work; they miss school and doctors' appointments; they rely on neighbors to watch their kids.  When their case is finally called and they stand before a judge, the appearance usually lasts less than a few minutes, and the case is perfunctorily adjourned for another date.

3.      Adjournment after adjournment, people wait for hours to see a judge only to be told to come back yet another day.  The months often turn into years.  People's lives are put on hold as their fate hangs in the balance.  The process can feel interminable.

4.      For Sarah Bello, it took 1,166 days and 33 court dates—30 of which were scheduled trial dates—before the charges against her were adjourned in contemplation of dismissal.[2]  For Joseph Bermudez, it took 1,258 days and 38 court dates before he could get his day in court, have a trial, and be acquitted.  At least 16 times, both sides were ready for trial, but there were no misdemeanor trial courtrooms ("Trial Parts") available.  John Carridice waited 1,009 days and had 20 court dates before he finally got a trial and was acquitted.  Though their cases were ultimately resolved in their favor, the damage inflicted by Court Delay—jobs and opportunities lost, lives disrupted, and relationships strained—had already been done.  For those still in the system, and those who may be, the harm continues.

---

[2] Ms. Bello's name has been changed for the purposes of this complaint in order to protect her privacy as a victim of domestic violence.

5.      These experiences are commonplace in Bronx Criminal Court.  At the beginning of 2016, there were 2,378 misdemeanor cases that had been pending for over 365 days, and 538 cases that had been pending for over *two years*.[3]  In 2014, it took twice as long to resolve an average misdemeanor case in Bronx Criminal Court's All Purpose Parts ("AP Parts")—the high-volume courtrooms that handle pre-trial misdemeanor matters—as contemplated by the New York State Unified Court System (the "New York Courts") guidelines.

6.      There are hundreds of misdemeanor cases scheduled for trial each week in which both sides are ready to proceed.  But trials scarcely happen.  The Trial Parts often sit locked and empty.   In 2015, there were over 45,000 misdemeanor arraignments in the Bronx, but only 98 misdemeanor trials.  In an average week in Bronx Criminal Court, more than 800 new misdemeanor cases enter the system, but fewer than two are resolved by trial.

7.      The few people who manage to exercise their right to trial in misdemeanor cases wait on average 688 days for a non-jury bench trial and an astonishing 897 days for a jury trial. For many, the wait is far longer.

8.      New York's speedy trial statute requires prosecutors to be ready for trial within 90 days of arraignment for class A misdemeanors, 60 days for class B misdemeanors, and 30

---

[3] Statistics for the 2016 calendar year are not publicly available.  Unless otherwise noted, the statistics cited in this Complaint are drawn from: Criminal Court of City of N.Y., N.Y. State Unified Court Sys., Bronx County Misdemeanor Activity Report: Full Year 2015 (2015); Criminal Court of City of N.Y., Annual Report: 2015 (2016), *available at* https://www.nycourts.gov/COURTS/nyc/criminal/2015_crim_crt_ann_rpt_%20062316_fnl2.pdf; Criminal Court of City of N.Y., Annual Report: 2014 (2015), *available at* https://www.nycourts.gov/COURTS/nyc/criminal/cc_annl_rpt_2014.pdf; N.Y. State Unified Court Sys., The Bronx Criminal Division: Merger After Five Years (2009) [hereinafter "Merger Report"], *available at* https://www.nycourts.gov/publications/pdfs/BronxReport11-09.pdf; and Press Release, N.Y. State Unified Court Sys., State Court System Reports Dramatic Cut in Felony Case Inventory, Announces Plan to Slash the Borough's Misdemeanor Backlog and Names New Bronx Appointment (Dec. 11, 2013) [hereinafter "Dec. 2013 Press Release"], *available at* http://www.nycourts.gov/press/pdfs/pr13_14a.pdf.

days for non-criminal violations.  Time waiting for trial is not counted against these statutory

limits, however, if it is attributable to Court Delay, such as when there are no Trial Parts

available or when congested court calendars require extended adjournments between scheduled

court dates.  As a result, New York's statutory speedy trial law is a functionally meaningless tool

to ensure compliance with constitutional speedy trial mandates.

       9.     Court Delay corrupts every stage of a criminal case.  From the inception of their

cases at arraignment—confronted with the reality of Court Delay, and with little hope for a

timely trial—many people charged with misdemeanors in the Bronx plead guilty in order to stem

the ongoing costs associated with returning to court for months on end.  They have no

meaningful or timely opportunity to test the state's evidence against them at trial or to vindicate

other important constitutional rights, such as the right against unreasonable search and seizure, in

pretrial evidentiary hearings.  The inordinate delays, combined with the lack of trial capacity,

make trials—and certainly speedy trials—functionally unattainable in Bronx Criminal Court.

       10.    Bronx Criminal Court is an outlier.  Manhattan does not have these delays.

Brooklyn does not have these delays.  Queens does not have these delays.  Staten Island does not

have these delays.  Only the Bronx, the poorest county in New York State, and the borough with

the highest percentage of residents who are people of color, experiences such severe Court

Delay.  Indeed, in Bronx Criminal Court, people of color make up 95% of all misdemeanor

arraignments, compared to approximately 85% in Manhattan, Brooklyn, and Queens, and 56% in

Staten Island.[4]

---

[4] N.Y. State Div. of Criminal Justice Servs., New York City: Misdemeanor Arraignments in
Criminal Court (Apr. 21, 2016) (electronic spreadsheet).

11.     And despite having fewer misdemeanor case filings than either Brooklyn or Manhattan, as recently as 2013, Bronx Criminal Court had more misdemeanors pending over one year than all of the other boroughs *combined*.

12.     Systemic Court Delay not only undermines the legal and moral legitimacy of the criminal justice system, but it also acts as a significant obstacle to economic opportunity and social stability for people accused of misdemeanors in the Bronx, their families, and their communities.  Thousands of people accused of misdemeanors in the Bronx must endure significant burdens and costs as a result of their unnecessarily prolonged prosecutions, in the form of missed work, lost wages, school absences, rescheduled medical appointments, childcare emergencies, strained professional and familial relationships, and psychological stress.

13.     Court Delay in Bronx Criminal Court also negatively affects every institutional stakeholder in the Bronx criminal justice system—prosecutors, the defense bar, and local city government alike.  The Bronx District Attorney has lamented the drain on already scarce resources caused by Court Delay, and the New York City Mayor's Office of Criminal Justice has identified Court Delay in Bronx Criminal Court as a serious problem.  Court Delay serves no one's interests.

14.     In April 2013, former New York State Chief Judge Jonathan Lippman called Court Delay in the Bronx "intolerable" and "entirely unacceptable."[5]  It is also unconstitutional.

15.     Plaintiffs Christopher Trowbridge, Michael Torres, Ronnie Pagan, Juan Ortiz, Luis Virella, Jason Garcia, and Joseph Joshua (collectively, the "Named Plaintiffs") bring this civil rights lawsuit on behalf of themselves and those similarly situated to remedy the violation

---

[5] William Glaberson, *Faltering Courts, Mired in Delay*, N.Y. Times, Apr. 13, 2013, http://www.nytimes.com/2013/04/14/nyregion/justice-denied-bronx-court-system-mired-in-delays.html.

of their rights secured by 42 U.S.C. § 1983 and the Sixth and Fourteenth Amendments to the United States Constitution.[6]

## JURISDICTION AND VENUE

16.    This action is authorized by 42 U.S.C. § 1983.  Subject matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because this action seeks redress for violations of Plaintiffs' rights under the Sixth and Fourteenth Amendments to the United States Constitution.

17.    Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper.  Rule 65 of the Federal Rules of Civil Procedure authorizes injunctive relief.  This Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

18.    Venue is proper in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Southern District of New York.

## PARTIES

19.    The Plaintiff Class consists of all persons who are being or will be prosecuted in Bronx Criminal Court with a misdemeanor or lesser offense as the top charge.

20.    Plaintiffs Trowbridge, Torres, Ortiz, and Virella are all residents of the Bronx. Plaintiffs Pagan, Garcia, and Joshua are residents of Manhattan.

21.    Defendant Janet DiFiore is the Chief Judge of the New York State Court of Appeals, Chief Judicial Officer of the New York Courts, and Chair of the Administrative Board

---

[6] The Court dismissed the claims of Christopher Trowbridge, Michael Torres, Ronnie Pagan, and Juan Ortiz for lack of standing in its December 22, 2016 Memorandum Order and Decision (ECF No. 39).  The Amended Complaint continues to assert their claims in order to preserve their appellate rights.

of the New York Courts (the "Chief Judge"), with offices at 25 Beaver Street, New York, New

York.  The Chief Judge is responsible for the establishment and enforcement of the

administrative polices of the New York Courts, including Bronx Criminal Court, and for the

courts' compliance with law.  The Chief Judge is sued in her official capacity.

22.     Defendant Lawrence Marks is Chief Administrator and Chief Administrative

Judge of the New York Courts (the "Chief Administrative Judge"), with offices at 25 Beaver

Street, New York, New York.  The Chief Administrator is responsible, on behalf of the Chief

Judge, for supervising the administration and operation of the New York Courts.  The Chief

Administrative Judge is sued in his official capacity.[7]

## CLASS ALLEGATIONS

23.     The Plaintiff Class consists of all persons who are being or will be prosecuted in

Bronx Criminal Court with a misdemeanor or lesser offense as the top charge.

24.     This action is properly maintainable as a class action because all four

requirements of Rule 23(a) of the Federal Rules of Civil Procedure are satisfied:

25.     *Numerosity*: The members of the class are sufficiently numerous that joinder of all

members is impracticable.  In 2015, there were 45,928 people arraigned on misdemeanor charges

in the Bronx.  At the end of 2015, there were 12,445 misdemeanor cases pending in Bronx

Criminal Court.  Joinder is also impracticable because many potential members of the class are

---

[7] The Chief Judge is required by § 249 of the New York Judiciary Law to establish a system of
"internal control" for the New York Courts, defined as "a process that integrates the activities,
plans . . . systems, resources and efforts . . . and that is designed to provide reasonable assurance
that the organization will achieve its objectives and mission.  The objectives of an internal
control system include . . . promoting the effectiveness and efficiency of operations."  The Chief
Judge, in turn, delegates much of his or her authority to the Chief Administrative Judge, who is
responsible for the administration and operation of the New York Court System.  N.Y. Jud. Law
§ 212.  The Chief Administrative Judge has supervisory authority over all of the New York
Court System's administrative activities, including the temporary reassignment of judges and the
formation of the courts.  22 N.Y. Comp. Codes R. & Regs. § 80.1.

not aware that their rights will be violated and that they have the right to seek redress in court. Further, putative class members are unknown and, therefore, cannot practically be joined. There is no appropriate avenue for the protection of these potential class members' rights other than a class action.

26.     *Commonality*: There are questions of law and fact common to the class. These common questions include, but are not limited to: (a) whether there is a policy, practice, and/or custom of unlawful Court Delay in Bronx Criminal Court; (b) whether unlawful Court Delay in Bronx Criminal Court deprives people accused of misdemeanors and/or lesser offenses in the Bronx of their right to due process under the Fourteenth Amendment to the United States Constitution; (c) whether unlawful Court Delay in Bronx Criminal Court deprives people accused of misdemeanors in the Bronx of their right to a trial or right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution; and (d) whether the Chief Judge and the Chief Administrative Judge (collectively "Defendants") have encouraged, sanctioned, and/or failed to rectify the widespread policy, practice, and/or custom of unlawful Court Delay in Bronx Criminal Court, and whether such acts and/or omissions have caused the constitutional violations.

27.     *Typicality*: The claims alleged by the Named Plaintiffs are typical of the class they seek to represent, as they all allege violations of due process and the right to a speedy trial related to the policy, practice, and/or custom of unlawful Court Delay in Bronx Criminal Court. The legal theories under which the Named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the Named Plaintiffs are typical of the harms suffered by all members of the class.

28.     *Adequacy of Representation*: The Named Plaintiffs are adequate class representatives.  Named Plaintiffs are being prosecuted or are likely to be prosecuted in Bronx Criminal Court and will suffer harm from the unlawful denial of due process and the right to a speedy trial caused by Court Delay.  The Named Plaintiffs will fairly and adequately protect the interests of the other class members.  Plaintiffs' counsel includes attorneys from The Bronx Defenders, Emery Celli Brinckerhoff & Abady LLP, and Morrison & Foerster LLP—all of whom are experienced in federal class action litigation, including constitutional and civil rights litigation, and have the resources necessary to pursue this litigation.

29.     This action is properly maintainable as a class action under Rule 23(b)(1)(a) of the Federal Rules of Civil Procedure because prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that would be inconsistent or varying and, thus, establish incompatible standards of conduct for the parties opposing the class.

30.     This action is also properly maintainable as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby rendering final relief appropriate with respect to the Named Plaintiffs and the class as a whole.  The class members are entitled to relief to end Defendants' policy, practice, and/or custom of unconstitutional Court Delay in Bronx Criminal Court.

## FACTS

## I.     The Life Cycle of a Typical Misdemeanor Case in the Bronx

31.     All misdemeanor prosecutions begin with an arraignment in one of Bronx Criminal Court's arraignment courtrooms.  At the arraignment, defense counsel is assigned and a

judge makes a bail determination.  The District Attorney also may make a plea bargain offer.
Many people opt to resolve their cases at arraignment through a negotiated disposition.

32.    Cases that are not resolved at arraignment, however, are adjourned to an AP Part
for corroboration of the misdemeanor complaint ("conversion"), for motion practice, or for trial
in those cases where the complaint has been converted and motion practice is waived.[8]  Motion
practice in misdemeanor cases is largely a rote, *pro forma* exercise; hearings to determine the
constitutionality of searches, seizures, and identification procedures are granted as a matter of
course.  The hearings themselves, however, are not conducted until much later, if ever.

33.    Once motion practice is completed, the case is scheduled for "hearings and trial"
("Trial Date").  On Trial Dates, the judge asks if the parties are ready for trial.  If either side is
not ready, the judge adjourns the case and sets another Trial Date, usually four to six weeks in
the future.  If both sides are ready, the judge ascertains whether any Trial Parts are available.
When there are no Trial Parts available, as is most often the case, the parties are told, "There are
no parts," and the case is adjourned.

34.    Even in the rare instance when a Trial Part is available and a case is sent out for
trial, a trial typically will not commence.  A case sent to a Trial Part may be further postponed
for myriad reasons.  For example, given the small percentage of trial-ready cases that are sent out
to trial and the lack of predictability, key prosecution witnesses—often, police officers—
frequently are not available.  When prosecution witnesses fail to appear, cases are adjourned for
yet another Trial Date, and fully staffed Trial Parts sit idle.

35.    A judge may excuse a person charged with a misdemeanor from personally
appearing in court or make his or her appearance contingent on the prosecutor's trial readiness

---

[8] Cases may also be adjourned to a small number of specialized parts, such as the Domestic
Violence Misdemeanor Part.

and the availability of a Trial Part.  As a general rule, however, a person is required to appear in court on each and every court date, no matter how old the case is, no matter how reliably the person has shown up for court in the past, and regardless of the fact that no law mandates a personal appearance at every court date.

36.    For every court date they must attend, for whatever purpose, people are told to be in the courtroom at 9:30 a.m., though there may be more than 100 cases on the calendar in any given courtroom.  Consequently, a person accused of a misdemeanor frequently arrives at court at 9:00 a.m. and has to wait, sometimes until 4:30 p.m., for his or her perfunctory court appearance.

## II.    Individual Examples of Court Delay

37.    The experiences of Sarah Bello, Joseph Bermudez, and John Carridice are emblematic of the problem of Court Delay in Bronx Criminal Court.  Their experiences are the norm for people accused of misdemeanors in the Bronx, not the exception.

### *Sarah Bello*

38.    Sarah Bello is a 40-year-old single mother of four, originally from Ghana.

39.    Ms. Bello came to the United States in 2003.  All four of her children are United States citizens.  In 2008, Ms. Bello married a United States citizen.  Once they were married, however, Ms. Bello's husband became abusive and the two later divorced.

40.    Ms. Bello subsequently filed a petition pursuant to the Violence Against Women Act (VAWA) with the United States Citizenship and Immigration Services, seeking eligibility for legal permanent status as a victim of domestic violence.  Ms. Bello's VAWA petition was granted, and on August 23, 2011, she applied for legal permanent residency in the United States.

An interview was scheduled with immigration officials for September 16, 2013 in order to determine Ms. Bello's final eligibility for adjustment of status.

41.     On September 9, 2012, Ms. Bello had a dispute with an acquaintance over payment for a used car.  She was arrested and prosecuted for misdemeanor assault in Bronx Criminal Court.  Ms. Bello—who has no criminal record—adamantly denied the charges.

42.     Ms. Bello had 33 court dates, including 30 scheduled Trial Dates, before she ultimately accepted an adjournment in contemplation of dismissal, a disposition requiring no admission of guilt and resulting in a full dismissal of the charges, on November 19, 2015—1,166 days after her initial arraignment.

43.     On nine scheduled Trial Dates, both parties were prepared to go to trial, but there were no Trial Parts available.

44.     On 12 scheduled Trial Dates, the prosecution stated not ready for trial and requested adjournments.

45.     Due to Court Delay, Ms. Bello's misdemeanor case was still pending at the time of her immigration interview on September 13, 2013, more than a year after her initial arraignment.  The Adjustment Officer held Ms. Bello's application for legal permanent residency in abeyance pending the outcome of her criminal case in Bronx Criminal Court.

46.     On July 7, 2015, Ms. Bello's application was denied because her case in the Bronx was still pending, and she was unable to provide immigration officials with proof of a final disposition.

47.     Court Delay also threatened Ms. Bello's livelihood and her ability to provide for her children.  For many years, Ms. Bello has worked as a home health aide, a position that requires her to be licensed with the state of New Jersey.  In September 2013, Ms. Bello learned

that the New Jersey Board of Nursing could not process her application to renew her employment license because of her open criminal case in the Bronx.  Because she was unable to provide a final disposition showing that the case had been resolved, Ms. Bello was suspended from her job working as a home health aide with a senior-care organization.  Ms. Bello was out of work for a number of months.  Once the case was resolved, she was able to get her license reinstated.

***Joseph Bermudez***

48.     Joseph Bermudez is a 36-year-old Latino man, a married father of one, and a lifelong resident of the Bronx.  He works as a warehouse manager at an appliance company.

49.     On July 7, 2012, Mr. Bermudez was involved in a traffic accident and taken to a police precinct, where he agreed to take a blood alcohol test.  Even though his blood alcohol level was below the legal limit, he was arrested for drunk driving.  He was arraigned in Bronx Criminal Court on July 8, 2012.

50.     Mr. Bermudez had 38 scheduled court dates, including 28 Trial Dates, before his case was sent out to trial in December 2015—1,255 days after his initial arraignment.[9]  He was acquitted of all charges.

51.     On at least 16 Trial Dates, both parties were ready to proceed to trial, but there were no Trial Parts available.

52.     On five Trial Dates, the prosecution stated not ready for trial and requested adjournments.

---

[9] While Mr. Bermudez's driver license was not suspended during the pendency of his case, many people charged with drunk driving in the Bronx lose their privilege to drive for the entirety of their pending misdemeanor case.  As a result, in the Bronx, people often lose their driving privileges for two or three years waiting for a trial, despite the fact that the maximum license suspension allowed after a misdemeanor conviction is one year.

53.     Mr. Bermudez repeatedly rejected non-criminal, non-incarceratory plea offers and requested a trial.

54.     Mr. Bermudez was ultimately acquitted after a trial that took three days.

**John Carridice**

55.     John Carridice is a 38-year-old father of four who resides in the Bronx.  He has an associate's degree and is working toward a bachelor's degree in social work and psychology, with the aim of becoming a children's therapist.

56.     On September 7, 2012, Mr. Carridice saw two young men about to fight on the street and intervened to separate the men.  Mr. Carridice was trying to deescalate the situation when police officers arrived and placed Mr. Carridice in handcuffs.  After spending two days in jail, Mr. Carridice was arraigned in Bronx Criminal Court on September 9, 2012 and charged with resisting arrest, unlawful assembly, disorderly conduct, and harassment, all misdemeanors or non-criminal violations.

57.     There were 20 scheduled court dates in Mr. Carridice's case, including 19 Trial Dates, before Mr. Carridice's case was sent out to trial in June 2015—1,003 days after his arraignment.  He was ultimately acquitted of all charges on June 15, 2015.

58.     On ten Trial Dates, both parties were ready to proceed to trial, but there were no Trial Parts available.

59.     On six Trial Dates, the prosecution stated not ready for trial and requested adjournments.

60.     Mr. Carridice worked for a children's aid organization and, as a result of the pending case, was given limited hours at work and was prevented from working around children. He was also denied other full-time jobs because of the open misdemeanor case.

61.     Mr. Carridice was also pursuing an associate's degree in psychology from Bronx Community College.  The Court Delay in his case severely disrupted Mr. Carridice's studies.  On one occasion, Mr. Carridice was forced to take an important midterm exam two weeks early in order to accommodate a scheduled Trial Date.  As a result, Mr. Carridice did not have as much time as he needed to study, his performance on the exam suffered, and his GPA fell below the cutoff for an important scholarship.  On the Trial Date that caused the disruption, the case was perfunctorily adjourned for another date.

## III.     The Named Plaintiffs

### *Michael Torres*

62.     Plaintiff Michael Torres is a 43-year-old Latino man who lives in the Bronx with his wife and two stepdaughters.  For the past nine years, Mr. Torres has worked in the construction industry in multiple capacities.  He currently works as a glazier, installing windows and aluminum panels on high-rise buildings being constructed across New York City.

63.     On September 26, 2011, Mr. Torres was on his way to a job interview when two police officers stopped and searched him without justification or consent.  A small amount of marijuana was recovered from inside a sweatshirt he was carrying.  After spending a full night in police custody, Mr. Torres was arraigned in Bronx Criminal Court on September 27, 2011 and charged with misdemeanor possession of marijuana.

64.     In all, there were 14 scheduled court dates in Mr. Torres' case, including ten Trial Dates.

65.     On seven of the scheduled Trial Dates, the prosecution stated not ready for trial and requested adjournments.

66.     On October 9, 2013—743 days after Mr. Torres' arraignment—counsel for Mr. Torres filed a motion to dismiss on statutory speedy trial grounds.  The motion was denied on November 22, 2013.  Mr. Torres could not appeal that ruling because his case was ultimately dismissed and there were no grounds for an interlocutory appeal.

67.     At a pretrial hearing on February 20, 2014—877 days after his initial arraignment—the police officer who had arrested Mr. Torres testified that he had no independent recollection of the circumstances leading up to Mr. Torres' arrest, and the case was dismissed.

68.     Mr. Torres was required to be in court on each and every one of his 14 court dates.  He sometimes waited as long as six hours before his case was perfunctorily adjourned. During periods of time when Mr. Torres was employed, he was forced to take an entire day off work, losing pay and frustrating his supervisor.

69.     In 2013, Mr. Torres was let go from a job because of the number of days he had been forced to take off to appear in court.

70.     The denial of Mr. Torres's rights to due process and a speedy trial took a serious emotional, mental, and financial toll on Mr. Torres and his family.  In addition to the lost wages and employment, Mr. Torres continued to suffer anxiety about keeping his job.  The problems at work spilled over into his family life, causing significant tension between Mr. Torres and his wife.

71.     Mr. Torres is likely to be arrested, prosecuted, and subjected to unconstitutional Court Delay in Bronx Criminal Court again.  Mr. Torres' job as a glazier requires Mr. Torres to use a folding knife to cut away loose sealant and ensure proper installation of large glass windows.  Mr. Torres must carry his own knife to and from work on a daily basis.  Although this folding knife is legal and found in home improvement and camping supply stores, police officers

regularly arrest, and the Office of the District Attorney regularly prosecutes, people—primarily people of color in low-income communities like the South Bronx—for possession of such knives under the law prohibiting possession of gravity knives.  This practice is well documented and widespread.[10]  Indeed, Mr. Torres was arrested and prosecuted under the gravity knife statute for possessing a lawful folding knife on at least one prior occasion in Bronx Criminal Court in October 2013.

72.     Mr. Torres is also likely to be arrested and prosecuted for unlicensed driving as a result of a license suspension he received in Florida and the subsequent suspension of his privilege to drive in New York.  Mr. Torres has been unable to travel to Florida to clear the license suspension and expects that his license will remain suspended for the foreseeable future. Despite having a suspended license for the past six years, Mr. Torres must continue to drive on occasion in order to get to remote job sites not served by public transportation.  Mr. Torres has already been prosecuted for unlicensed driving on at least two occasions in the past.

***Ronnie Pagan***

73.     Ronnie Pagan is a 37-year-old Latino man who lives in Manhattan.

74.     Mr. Pagan was unlawfully stopped and searched in a public park on the evening of February 15, 2014, and charged with misdemeanor drug possession, obstruction of governmental administration, and trespass.  Mr. Pagan spent two days in jail before he was arraigned in Bronx Criminal Court on February 17, 2014.  From the very beginning of his case, he was determined to seek a trial.

75.     In all, Mr. Pagan's case had 18 scheduled court dates, including 16 Trial Dates.

---

[10] *See* Jon Campbell, *How a '50s-Era New York Knife Law Has Landed Thousands in Jail*, The Village Voice, Oct. 7, 2014, http://www.villagevoice.com/news/how-a-50s-era-new-york-knife-law-has-landed-thousands-in-jail-6662589.

76.     On 11 of Mr. Pagan's Trial Dates, both parties were prepared to begin trial, but there were no Trial Parts available.

77.     On three Trial Dates, the prosecution stated not ready for trial and requested adjournments.

78.     On March 21, 2016, 763 days after his arraignment, Mr. Pagan was unable to deal with the stress of having an open misdemeanor case any longer; he reluctantly accepted an adjournment in contemplation of dismissal in order to bring an end to the case.

79.     Mr. Pagan is likely to be arrested and prosecuted in Bronx Criminal Court again. Mr. Pagan's girlfriend and their four children live in a New York City Housing Authority (NYCHA) apartment building in the South Bronx.  Mr. Pagan lives with his mother in Manhattan, but regularly visits his girlfriend's building in the Bronx in order to care for his children.  Mr. Pagan is routinely stopped and—because his identification shows a Manhattan home address—he has on a number of occasions been arrested by police officers on suspicion of trespass in his girlfriend's building.  The City of New York's trespass enforcement practices in NYCHA residences have been well documented and are currently under the review of a federal monitor.  Because Mr. Pagan continues to visit his girlfriend and their children in a Bronx NYCHA residence, he will likely be arrested and subjected to unconstitutional Court Delay in Bronx Criminal Court again.

### Juan Ortiz

80.     Mr. Ortiz is a 61-year-old Latino man who lives in the Bronx.  In the early 2000's, Mr. Ortiz was diagnosed with colon cancer, for which he underwent surgery and received nine months of chemotherapy.  Mr. Ortiz's illness and the subsequent treatment made it difficult for Mr. Ortiz to work and ultimately led to him losing his job of 12 years.  The anxiety

and stress Mr. Ortiz experienced due to his medical and financial condition gave rise to a number of psychiatric issues for which Mr. Ortiz sought psychiatric treatment.

81.     From 2012 through 2015, Mr. Ortiz was prescribed multiple medications to treat his psychiatric condition.  The medications caused Mr. Ortiz to experience episodes of severe disorientation.  During these episodes, Mr. Ortiz would be gripped by a compulsion to take items from stores without paying.  Between December 2012 and March 2015, Mr. Ortiz was arrested and prosecuted 14 times for the misdemeanors of petit larceny and/or possession of stolen goods in Bronx Criminal Court.  He was ultimately given a jail sentence of one year and was released in September 2015.

82.     Mr. Ortiz continues to struggle with the fallout from his fight with cancer and the attendant psychiatric issues.  He and his care providers are still experimenting with different medications to try to identify one that mitigates his symptoms and alleviates his urge to shoplift. For the same reasons that Mr. Ortiz was arrested and prosecuted 14 times, he will likely be arrested and prosecuted in the Bronx again and subjected to unconstitutional Court Delay in Bronx Criminal Court.

*Christopher Trowbridge*

83.     Christopher Trowbridge is a 42-year-old African-American man who lives in the South Bronx.  He has struggled with heroin addiction for the past 18 years and has spent multiple periods in detox and rehabilitation facilities.

84.     Mr. Trowbridge's struggle with addiction has also led to multiple arrests and prosecutions in Bronx Criminal Court.  He has been prosecuted in Bronx Criminal Court at least six times since 2008.

85.     Mr. Trowbridge continues to deal with the challenges of a long-term drug addiction.  He has lived through the cycle of recovery and relapse multiple times, and will likely be arrested and prosecuted in the Bronx again and subjected to unconstitutional Court Delay in Bronx Criminal Court.

***Luis Virella***

86.     Luis Virella is a 69-year-old Latino father and grandfather who lives in the Bronx.  In 1970, at the age of 23, he moved to New York City from Puerto Rico.  Before retiring in 2014, Mr. Virella worked for 38 years as a disability analyst for the State of New York.

87.     On February 24, 2014, Mr. Virella was arrested and charged with drunk driving in the Bronx.  He was arraigned in Bronx Criminal Court the same day.  He has no criminal record.

88.     Mr. Virella has had 27 scheduled court dates.  As of January 23, 2017, Mr. Virella's case will have been pending for 1,064 days.

89.     Since June 2014, when it became clear that a plea was unlikely, there have been 22 scheduled Trial Dates.  On at least 11 of those Trial Dates, both parties were ready to proceed to trial, but there were no Trial Parts available.  On four of those dates, the prosecution stated not ready for trial and requested adjournments.

90.     Mr. Virella's case is still pending.  Court Delay has consistently prevented Mr. Virella from obtaining a speedy trial in violation of his constitutional rights.

91.     Mr. Virella's prolonged prosecution has caused him to experience depression and anxiety and has caused tension with his family.

92.     Mr. Virella's driving privileges have been suspended for the duration of his case.

*Jason Garcia*

93.     Jason Garcia is a 30-year-old Latino man who lives in Manhattan.  He graduated from high school in the Bronx and earned his bachelor's degree in criminal justice.  For the past five years, Mr. Garcia has worked as the facilities manager at a Catholic community center in Manhattan.  As part of his work duties, Mr. Garcia coordinates the center's weekly food pantry and sandwich lines.

94.     On July 12, 2015, Mr. Garcia was arrested and charged with drunk driving in the Bronx.  After spending over 24 hours in police custody, Mr. Garcia was arraigned in Bronx Criminal Court on July 13, 2015.

95.     Mr. Garcia has had 12 scheduled court dates, of which 11 were Trial Dates.  As of January 23, 2017, Mr. Garcia's case will have been pending for 560 days.

96.     On at least six Trial Dates, both parties were ready to proceed to trial, but there were no Trial Parts available.

97.     On three Trial Dates, the prosecution stated not ready for trial and requested adjournments.

98.     Mr. Garcia's case is still pending.  Court Delay has consistently prevented Mr. Garcia from obtaining a speedy trial in violation of his constitutional rights.

99.     Mr. Garcia has been required to be present at the majority of his court appearances, sometimes waiting hours before his case was called.  The resulting work absences have caused tension with Mr. Garcia's supervisor at work.  It has also caused Mr. Garcia anxiety and has affected his relationships with his family.

100.     Mr. Garcia's driving privileges have been restricted for the entire pendency of the case.

*Joseph Joshua*

101.    Joseph Joshua is a 31-year-old African-American man who lives in Manhattan. He works as a porter in an apartment building in Manhattan.

102.    On June 6, 2015, Mr. Joshua was at a community barbeque in the Bronx.  While at the barbeque, Mr. Joshua observed police officers arrest another individual and decided to record the interaction on his smartphone.  Police officers approached Mr. Joshua and placed him under arrest.  After spending a night in police custody, Mr. Joshua was arraigned in Bronx Criminal Court on June 7, 2015 and charged with resisting arrest, inciting to riot, obstruction of governmental administration, and disorderly conduct, all misdemeanors or non-criminal violations.

103.    Mr. Joshua has had 13 scheduled court dates, including 11 Trial Dates.  As of January 23, 2017, Mr. Joshua's case will have been pending for 596 days.

104.    On six Trial Dates, both parties were ready to proceed to trial, but there were no Trial Parts available.

105.    On three Trial Dates, the prosecution stated not ready for trial and requested adjournments.

106.    Mr. Joshua's case is still pending.  Court Delay has consistently prevented Mr. Joshua from obtaining a speedy trial in violation of his constitutional rights.

107.    Mr. Joshua has been required to be present at the majority of his court appearances, sometimes waiting hours before his case was called.  He has had to use personal days to take off time from work, and the resulting work absences have caused tension with Mr. Joshua's supervisor and coworkers.  It has also caused Mr. Joshua anxiety and has affected his family.

**IV.    Systemic Violations of the Right to Trial and Speedy Trial in Bronx Criminal Court**

108.    The harm to the Named Plaintiffs and the putative class members directly results

from a policy, pattern, and practice of excessive and unreasonable Court Delay that plagues

Bronx Criminal Court; violates due process and the right to a speedy trial; and makes it virtually

impossible for people accused of misdemeanor crimes in the Bronx to exercise their right to trial

in a meaningful and timely manner.

***The Crushing Backlog of Misdemeanor Cases***

109.    Bronx Criminal Court has jurisdiction over all misdemeanor cases prosecuted in

the Bronx.  In 2015, there were 45,928 misdemeanor arraignments in Bronx Criminal Court,

significantly fewer than the number of case filings in Manhattan (62,350), Brooklyn (60,511), or

Queens (46,360).  Yet, Bronx Criminal Court had 12,527 misdemeanor cases pending at the end

of the year, compared to 9,930 in Brooklyn, 10,885 in Manhattan, and 8,081 in Queens.

110.    In the past year, the number of misdemeanor cases pending in the Bronx has

*increased*, even while the number of misdemeanor arraignments has decreased.

***Excessive and Unreasonable Systemic Delays in Processing Misdemeanor Cases***

111.    The Standards and Goals Guidelines for the Disposition of Criminal Cases issued

by the New York Courts ("NY Court Standards") are an administrative tool developed and

disseminated by the judiciary in 2008 "to assist the courts at every level in monitoring the

progress of cases through the criminal court system."[11]  The NY Court Standards dictate that a

misdemeanor case should reach final disposition within *90 days* of arraignment.

112.    The NY Court Standards are consistent with national standards.  In 2011, The

National Center for State Courts, the Conference of State Court Administrators, the Conference

---

[11] Merger Report, *supra* note 3, at 31.

of Chief Justices, the American Bar Association House of Delegates, and the National

Association for Court Management all adopted case disposition guidelines dictating that 90% of

misdemeanor cases should be resolved within 90 days.[12]

113.    In the Bronx, however, these guidelines are meaningless.  At the end of 2015, the

average age of misdemeanor cases pending in the Bronx was 219 days; over 64% of Bronx

Criminal Court's pending cases exceeded NY Court Standards; and 19% of cases (2,378) were

over 365 days old.  There were 538 cases that had been pending for over two years.

114.    In December 2013, the last time citywide comparative data was publicly

available, the Bronx had more misdemeanors pending in excess of one year (2,106) than the four

other boroughs of New York City combined—Brooklyn (657), Manhattan (594), Queens (331),

and Staten Island (287).  These numbers are even more telling when compared to the respective

boroughs' pending misdemeanor caseloads.  In the Bronx, 14.5% of the pending cases were over

a year old, compared to 4.9% in Manhattan, 5.3% in Brooklyn, and 4.1% in Queens.

115.    In early 2014, the New York Courts created the Bronx Misdemeanor Standards &

Goals Part ("MSG"), a specialized courtroom dedicated to processing the oldest misdemeanors

in Bronx Criminal Court, presided over by the Supervising Judge of Bronx Criminal Court.  By

the end of 2015, there were 426 misdemeanor cases pending in MSG, with an average pending

age of 827 days.  That was an *increase* of 84 days from the previous year, when the average

pending age of cases in MSG was 743 days, and an *increase* of 264 days from the time MSG was

founded, when the average age of cases pending in MSG was 563 days.

---

[12] Richard Van Duizend, David C. Steelman & Lee Suskin, Nat'l Ctr. for State Courts, Model
Time Standards for State Trial Courts (2011), *available at* http://www.ncsc.org/Services-and-
Experts/Technology-tools/~/media/Files/PDF/CourtMD/Model-Time-Standards-for-State-Trial-
Courts.ashx.

*The Failure to Ensure the Right to a Trial*

116.     Due to the policy, pattern, and practice of systemic Court Delay, cases cannot get resolved.  Delay and congestion beget more delay and congestion as the number of pending cases competing for scarce resources increases.  The longer a case is pending, the more likely it is that witnesses will become unavailable.  The backlog increases caseloads for defense attorneys and prosecutors alike, and it is harder for everyone to do their jobs.  For prosecutors, in particular, it becomes difficult to evaluate a case and make an appropriate plea bargain offer until the threat of a trial is imminent.

117.     In 2015, the average age of cases resolved in the AP Parts was 162 days, 80% longer than the 90 days prescribed by the NY Court Standards.  By contrast, the average disposition age in Brooklyn was just 18% longer than the standard (106 days); in Queens, 31% longer than the standard (118 days); and in Manhattan, 34% longer than the standard (121 days).

118.     Most significantly, the few misdemeanor defendants who are able to exercise their right to trial in the Bronx must wait on average 688 days for a non-jury bench trial and 897 days for a jury trial.  The wait for a jury trial in the Bronx is 120% higher than in Brooklyn (407 days), 58% higher than in Manhattan (568 days), and 48% higher than in Queens (605 days).

119.     The age of cases in Bronx Criminal Court is both a symptom and a cause of the failure to ensure the right to a trial for people accused of misdemeanors in the Bronx.  As a 2009 report by the New York Courts found, a court's "capacity to dispose of its cases flows directly from its ability to provide an imminent trial."[13]  In Bronx Criminal Court, there are many thousands of misdemeanor cases scheduled for trial every four-week term.  In that same period, there are, on average, fewer than eight trials.

---

[13] Merger Report, *supra* note 3, at 20.

120.    Having more functioning Trial Parts at any given time would help ease Court

Delay.  The six misdemeanor Trial Parts in Bronx Criminal Court, however, regularly sit idle—

often with the doors locked—unable to conduct trials for want of judges, clerks, court officers, or

court reporters.  According to Bronx Criminal Court's own records, in 2015 the Trial Parts had

judges assigned to them only 69% of the time (excluding court holidays).[14]

121.    This figure, however, dramatically overstates the Court's actual, current trial

capacity.  A significant percentage of the time that judges are assigned to Trial Parts, the

courtrooms are actually closed.  Even when Trial Parts are technically open, there is frequently

no activity in the courtroom.  As one reporter found, "many of the trial parts . . . were simply not

open," and "it is also unclear how it is determined when a trial part is in use: a judge told

attorneys all trial parts were in use when a visit to one nearby found another judge sitting in an

empty room."[15]

122.    In the overwhelming majority of cases scheduled for trial where both the

prosecution and defense are ready to proceed, there are no Trial Parts available to conduct

proceedings.  Only a small percentage of cases are actually sent to Trial Parts, and an even

smaller percentage actually commence proceedings.  The remaining "trial-ready" cases are

adjourned, only to repeat the exercise weeks or months later.

123.    Most misdemeanor cases present few, if any, legal novelties or factual

complexities.  Often, the only witnesses are New York City police officers and the evidence

consists of little more than the property, if any, recovered at the time of arrest.  Trials, when they

---

[14] Bronx Criminal Court, Schedules of Judges Assignments: Terms 1-13 (2015).
[15] Catie Edmondson, *Progress Elusive as Bronx DA Cruises Toward Reelection*, Gotham Gazette, Aug. 11, 2015, http://www.gothamgazette.com/index.php/government/5845-progress-elusive-as-bronx-da-cruises-toward-reelection.

do occur, can often be conducted in a day, or even an afternoon.  It is exceedingly rare that a misdemeanor trial lasts more than two or three days.

124.    In 2015, however, there were only 98 misdemeanor trials in the Bronx, compared to 164 in 2014, representing an over 40% decrease year-over-year.

**V.    New York's Statutory Framework: For Prosecutors Only**

125.    The right to a speedy trial is codified in New York Criminal Procedure Law §§ 30.20 and 30.30.  Section 30.20 mandates that "[a]fter a criminal action is commenced, the defendant is entitled to a speedy trial."  In practice, the mechanism through which judges enforce the right to a speedy trial is § 30.30.

126.    Although § 30.30 is generally referred to as New York's "statutory speedy trial right," it functions more as a "prosecutorial readiness rule."  This is by design.

127.    Section 30.30 requires prosecutors to be ready for trial within 90 days of arraignment for A misdemeanors, 60 days for B misdemeanors, and 30 days for non-criminal violations (the "§ 30.30 Time Limits").

128.    Section 30.30 lays out clear substantive guidelines for judicial decisionmaking: §§ 30.30(1)(b)-(d) set forth the § 30.30 Time Limits; § 30.30(3) exempts certain types of cases from § 30.30 analysis; § 30.30(4) sets out time periods to be excluded from a court's calculation of statutory speedy trial time; and § 30.30(5) creates special rules for specific circumstances (such as when felonies are reduced to misdemeanors).  The remedy for a violation of § 30.30 is not discretionary: a court must dismiss a criminal case when the prosecution is not ready for trial within the § 30.30 Time Limits.

129.    Section 30.30 is the product of a specific historical moment.  In 1971, the Second Circuit, sitting en banc, expressed alarm that "there were 2,899 persons accused of felony in New

York State who had been held in jail three months or more awaiting disposition of the charges against them," and urged the state to "fashion a rule which will require standards of performance designed to guarantee speedy trials in state cases." *U.S. ex rel. Frizer v. McMann*, 437 F.2d 1312, 1314, 1316 (2d Cir. 1971).

130.    The Administrative Board, the administrative-policy arm of the New York Courts, proposed rules that would have required, among other things, dismissal of any criminal prosecution that was not brought to trial within six months.[16]

131.    In response to a concern that the administrative rules might cause a "legalized jailbreak," the State District Attorneys Association proposed § 30.30, a prosecutorial readiness rule rather than a speedy trial rule.[17]  It was passed three days before the Administrative Board's proposal was to become effective, preempting the proposed six-month speedy trial rule.

132.    As a result, statutory speedy trial time accrues only when the prosecution is responsible for the delay in the proceedings.  Section 30.30 excludes from statutory speedy trial calculations delays due to Court Delay, such as when there are no Trial Parts available or when congested court calendars require extended adjournments between scheduled trial dates.

133.    It is common practice for prosecutors in Bronx Criminal Court to state "not ready" for trial and request short adjournments, often for one week.  Because of pervasive Court Delay, however, cases are routinely adjourned for one to two months at a time. In such circumstances, only the requested adjournment, rather than the actual adjournment, is charged to the § 30.30 Time Limits.

---

[16] Report of the Administrative Board of the Judicial Conference of the State of New York (1972).
[17] Francis X. Clines, *Bill Would Slow Fast-Trial Order*, N.Y. Times, Feb. 7, 1972.

134.    Moreover, when both the prosecution and defense counsel state "ready" to begin trial, but there are no judges, court staff, or courtrooms available to commence trial, cases are regularly adjourned for weeks or months at a time.  None of that time is charged against the § 30.30 Time Limits.

135.    This dynamic results in cases stretching out long past the time contemplated by the § 30.30 Time Limits and the NY Court Standards.  Cases linger on the docket for years on end, adjourned repeatedly for trial, while only a small fraction of the time is charged against the § 30.30 Time Limits.  And because Trial Parts are so rarely available, prosecutors' actual trial readiness is rarely tested.

136.    Both supporters and opponents of § 30.30 at the time of its enactment recognized its limitations as a mechanism to ensure the right to a speedy trial.  Governor Rockefeller, who supported the passage of § 30.30, acknowledged that "without substantial modernization of our court system, without efficient case processing methods, and centralized court management and the necessary resources for both the courts and the components of the criminal justice system whose activities bear importantly on court operations, [§ 30.30] will not guarantee prompt trials or provide justice in the full and true sense of the word."[18]  His words have proved prophetic.  Another senator admitted, "I am voting for this bill very reluctantly because it is only a stopgap measure.  This is not justice.  This is not the kind of administration that is going to restore the confidence of the people in the courts."[19]

---

[18] Governor's Approval Memorandum at 2, Bill Jacket, L. 1972, ch. 184.
[19] N.Y. Senate Debate on Assembly Bill A10687-A, at 19 (1972) (statement of Sen. Bloom).

**VI.    Defendants' Failure to Remedy Known Violations**

137.    Defendants in this case have long been aware of the systemic and pervasive Court Delay in Bronx Criminal Court and its effect on due process, the right to trial, and the right to a speedy trial.  Yet, they have repeatedly failed to remedy the violations.

138.    For example, in a 2009 public report, the New York Courts recognized the need to expand trial capacity in the Bronx, recommending, in part, an increase in trial capacity through the assignment of additional judges and court staff.[20]

139.    From 2009 through 2015, the New York Courts absorbed nearly $400 million in increased costs, while its budget increased only $27.5 million.[21]  During this time, the New York Courts lost 2,000 employees.[22]  Former Chief Judge Lippman predicted that the failure of the budget to keep up with costs would "have a tremendous impact on the system.  At a minimum, [we are] going to see delays in the administration of justice, without question."[23]

140.    That is exactly what has happened.  As described by former Chief Administrative Judge Gail Prudenti, "[t]he substantial reduction in our workforce has depleted back-office staff, with resulting delays in processing court documents, frustrating the timely disposition of cases. In many courthouses, the loss of court officers and other courtroom staff has made it increasingly difficult to staff all court parts.  Back-office employees have at times been redeployed to courtroom duties, causing further delays in the processing of documents, or officers and

---

[20] The study found that "for every additional trial part added, an average of 490 additional dispositions are reached, either by trial or by plea in the trial part or by plea in a motion/conference part."  Merger Report, *supra note* 3, at 20.

[21] *See Report in Support of the Judiciary's 2015-2016 Budget Request*, N.Y.C. Bar Ass'n 1 (Feb. 2015), http://www2.nycbar.org/pdf/report/uploads/20072866-ReportinSupportoftheJudiciarys 2015-2016BudgetRequest.pdf [hereinafter "N.Y.C. Bar 2015-2016 Report"].

[22] *See id.* at 2.

[23] Thomas Kaplan, *Chief Judge Says Deal Will Require Hundreds of Layoffs in Court System*, N.Y. Times, Mar. 28, 2011, http://www.nytimes.com/2011/03/29/nyregion/29cuts.html.

courtroom clerks are shared between courtrooms, causing delays in the opening of court parts

until the required courtroom team is assembled.  Reduced staffing is causing delays in trials and

in deciding motions."[24]  Another former Chief Administrative Judge, Ann Pfau, had a similar

assessment: "We know [the budget cuts are] having an impact . . . People are waiting longer to

get to trial, and there are fewer trials."[25]  Former New York City Criminal Court Administrative

Judge Barry Kamins bemoaned that "we simply don't physically, economically have the

resources to get by."[26]  Both Judge Prudenti and Defendant Chief Administrative Judge Marks,

then serving as First Deputy Chief Administrative Judge, warned that "[a]fter five years of

essentially flat budgets from 2009-10 to 2013-14,"[27] the Judiciary would no longer be able to

"meet its constitutional mission" without additional funding.[28]

141.    In April 2013, former Chief Judge Jonathan Lippman publicly acknowledged the

"glaring problems" in the Bronx associated with Court Delay that date back "as long as [he] can

remember," referring to Court Delay in the Bronx as "intolerable" and "entirely unacceptable."[29]

142.    In December 2013, the New York Courts explicitly acknowledged the widespread

---

[24] Jonathan Lippman et al., New York State Unified Court System Budget: Fiscal Year 2014-2015, at iii (2013), *available at* https://www.nycourts.gov/admin/financialops/BGT14-15/2014-15-Budget.pdf.
[25] John Caher & Andrew Keshner, *Deep Overtime Cuts Bring Delay, Rethinking of Case Presentation*, N.Y.L.J., Nov. 28, 2011.
[26] Alice Brennan, *Right to a Speedy Trial? This Innocent Teenager Waited 3 Years in Jail*, Fusion, Apr. 28, 2014, http://fusion.net/story/5419/right-to-a-speedy-trial-this-innocent-teenager-waited-3-years-in-jail.
[27] *See* Letter from A. Gail Prudenti to Andrew M. Cuomo (Dec. 1, 2014), *in* Jonathan Lipmann et al., New York State Unified Court System Budget: Fiscal Year 2015-2016 (2014), *available at* http://www.nycourts.gov/admin/financialops/BGT15-16/2015-16-UCS-BUDGET.pdf.
[28] *See Joint Legislative Hearing on the 2014-2015 Judiciary Budget: Remarks of Chief Administrative Judge A. Gail Prudenti*, N.Y. State Assembly 1 (Feb. 5, 2014), http://assembly.state.ny.us/write/upload/files/testimony/20140205/20140205-PublicProtection-Prudenti.pdf; *see also Report in Support of the Judiciary's 2014-2015 Budget Request*, N.Y.C. Bar Ass'n (Feb. 2014), http://www2.nycbar.org/pdf/report/uploads/2014JudiciaryBudgetJudicialAdministrationReportFINAL2.4.14.pdf.
[29] Glaberson, *supra* note 5.

Court Delay in Bronx Criminal Court and listed as factors contributing to the problem "a large misdemeanor inventory" and "insufficient trial capacity, exacerbated by a shortage of judges to consistently preside over jury trial parts."[30]

143.    A February 2015 report by the New York City Bar Association affirmed that the failure to fund properly the New York City Criminal Court, of which Bronx Criminal Court is a part, has resulted in a shortage of judicial resources across all five of New York City's boroughs: "In Criminal Court, too few court officers, clerical staff, and reporters results in the closure of trial parts at the last moment.  Often there are available judges who are precluded from presiding over their parts.  Such conditions cause delays in trials, including those for incarcerated individuals."[31]

144.    In response to these concerns, and to a request from the judiciary for a 2.7% funding increase for the 2014-2015 year, Governor Cuomo touted that "[f]or the past three years my Administration and the Legislature have kept spending increases below 2 percent."  He characterized the budget request as "out of step with our fiscally responsible goal for all of New York State government," and stated his belief that "an efficient and effective Judiciary can robustly fulfill its constitutional duties with a spending increase at or below 2 percent."  He then urged the Legislature and the New York Courts to "reduce the Judiciary budget so that it is in line with the rest of State spending."[32]

145.    Funding for the New York Courts has failed to keep up with case backlogs.  The 2016-2017 state budget, announced by Governor Cuomo in mid-April 2016, included a funding

---

[30] Dec. 2013 Press Release, *supra* note 3.

[31] N.Y.C. Bar 2015-2016 Report, *supra* note 21, at 3.

[32] *Commentary of the Governor on the Judiciary*, N.Y. State Div. of Budget (2014-15), https://www.budget.ny.gov/pubs/archive/fy1415archive/eBudget1415/agencyPresentations/pdf/Commentary.pdf.

increase of $44.4 million for the New York Courts, representing a 2.4% increase over the previous year's budget.  The new budget, however, fails to offset $19.5 million of the $27.2 million cost of mandatory raises for New York's judges going into effect this year.

146.    For over a decade, the New York Courts have repeatedly promised reforms to address Court Delay, but have failed to remedy the systemic constitutional violations.  For example, in November 2004, the New York Courts merged Bronx Criminal Court with the Criminal Term of Bronx County Supreme Court (the "Merger") in an effort to curb felony and misdemeanor case backlogs.  While a 2009 report by the New York Courts found that the Merger had largely failed to achieve its overall goals, it also found that the number of *misdemeanor* trials jumped to nearly 350 per year and remained close to 300 through 2009.[33] Despite the improvement in misdemeanor trial capacity, which the 2009 report called "the most important factor in driving the resolution of criminal cases,"[34] the New York Courts abandoned the Merger in 2012.  A year later, Bronx Criminal Court's backlog of cases pending for more than a year was greater than the four other boroughs of New York City combined.

147.    In 2013, the New York Courts announced a misdemeanor initiative to address the problem, including but not limited to: (a) pledging three additional judges to the Bronx "to preside exclusively over misdemeanor trials"; and (b) implementing strict case management practices, such as shorter adjournments and tighter motion schedules.[35]  The reforms have either not materialized or have failed to remedy the problem.  Some reforms, such as a focus on shortening adjournment times, have actually had a negative impact on the system: while the average length of adjournments has decreased, the average time to disposition has increased,

---

[33] Merger Report, *supra* note 3, at 13.
[34] *Id.* at 1.
[35] Dec. 2013 Press Release, *supra* note 3.

meaning that defendants are forced to come back to court even more frequently over longer periods of time, increasing the burden of having an open case and diverting additional judicial resources.

148.    Prosecutors have also expressed concern about systemic Court Delay and its impact.  Former Bronx District Attorney Robert Johnson stated, "I believe [the Bronx] ha[s] really trailed behind in [trial capacity] for the past couple of decades.  We need to take a long-term look concerning additional judges, additional courtrooms, and additional staff to better handle the caseloads we are getting in."[36]  Other members of the District Attorney's office have echoed Johnson's sentiments.  One senior prosecutor asserted that "[o]ne of the primary problems we deal with is resources: judges, court rooms, court reporters, court officers that are needed . . . the more of that we have, the more efficient the system would be," while another former prosecutor lamented that "[t]here were never enough courtrooms to meet the needs of having a defendant tried in a timely fashion, there is no doubt about that.  So with more judges and more courtrooms, we'd be able to address the backlog of cases."[37]

149.    The new Bronx District Attorney, Darcel Clark, has identified Court Delay as one of the major problems facing the Bronx Criminal Court, noting, "I sat as a judge in the Bronx for 13 years, I know the delays that have hampered prosecution of cases."  Clark has called for more judges in the Bronx.[38]

---

[36] Interview, *District Attorney Rob Johnson: Justice and the Bronx*, The Bronx Chronicle, Dec. 5, 2014, http://thebronxchronicle.com/2014/12/05/district-attorney-rob-johnson-justice-bronx.
[37] Catie Edmondson, *Progress Elusive as Bronx DA Cruises Toward Reelection*, Gotham Gazette, Aug. 11, 2015, http://www.gothamgazette.com/index.php/government/5845-progress-elusive-as-bronx-da-cruises-toward-reelection.
[38] Rebecca Davis O'Brien, *Likely Bronx DA Has Plans*, Wall St. J., Oct. 27, 2015, http://www.wsj.com/articles/likely-bronx-da-has-plans-1445994155.

150.     Given the extensive and persistent nature of systemic Court Delay in Bronx Criminal Court, it has been the subject of widespread press coverage.  In 2013, the New York Times published a four-part series exploring the culture of delay in the Bronx courts, recognizing that "[t]he [Bronx] courts are so dysfunctional that those accused of minor offenses— misdemeanors like trespassing or driving with a suspended license—have all but lost the fundamental guarantee of the American legal system: the right to a trial."[39]

151.     Despite extensive media coverage and their own repeated acknowledgment of the depth of the debilitating Court Delay in Bronx Criminal Court, the Defendants have consistently failed to remedy the ongoing and widespread constitutional violations.  Defendants have failed to provide adequate resources, failed to allocate and manage existing resources properly, and failed to train, supervise, and monitor the staff and judges adequately to ensure compliance with constitutional mandates.

## VII.   The Human Costs of Systemic Court Delay

152.     Plaintiffs face a deprivation of their right to due process under the Fourteenth Amendment to the United States Constitution.  They also face a denial of their speedy trial rights under the Sixth and Fourteenth Amendments to the United States Constitution.

153.     The systemic violations of due process and the right to a speedy trial wreak havoc on the lives of people charged with misdemeanors.  Beyond the physical and psychological toll exacted by seemingly interminable and disproportionate delays—which, because of court congestion and a lack of trial capacity, may go on for years—each postponement of trial brings with it the potential for another missed day of work, lost wages, school absence, rescheduled

---

[39] William Glaberson, *In Misdemeanor Cases, Long Waits for Elusive Trials*, N.Y. Times, Apr. 30, 2013, http://www.nytimes.com/2013/05/01/nyregion/justice-denied-for-misdemeanor-cases-trials-are-elusive.html.

medical appointment, financial hardship, or childcare emergency.  People accused of misdemeanor offenses must pay for transportation to and from court.  Repeated absences from work can strain relationships with current employers, and potential future employers are less likely to hire people when a background check reveals a pending criminal case.  And the longer a case lasts, the more likely it is that a person will miss court and have a warrant issued for his or her arrest.

154.    For people working in the public sector or in jobs requiring state-issued licenses—such as security guards, home health aides, or cab drivers—an open case may lead to an immediate suspension without pay and, ultimately, termination.

155.    These damaging effects have been exacerbated by the recent practice of requiring people to come to court more frequently over the course of their cases for perfunctory appearances.  Although the average age of a misdemeanor case pending in Bronx Criminal Court between January 2014 and December 2015 did not materially change, the average adjournment—the length of time between court dates—decreased from 43 days to 36 days.  Thus, people are being required to return to court more often without any additional prospect of receiving a trial.

156.    Despite the fact that the overwhelming majority of court appearances amount to little more than calendaring exercises that are concluded in minutes, people charged with misdemeanors are often forced to spend hours or even entire days waiting for their court appearances.

157.    The tremendous costs and harms associated with these violations—including lost wages and adverse effects on employment prospects—fall particularly hard on residents of the Bronx, where unemployment rates are significantly higher than in the rest of New York City.

158.    Faced with the reality that trials are, for all intents and purposes, unattainable for the vast majority of people accused of misdemeanors in the Bronx, many are forced to abandon their constitutional right to a trial and resolve their cases through a negotiated disposition rather than wait for a trial that may never materialize.

## CLAIMS FOR RELIEF

### First Claim for Relief
(Violation of Due Process under the Fourteenth Amendment)

159.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs.

160.    Defendants, acting under the color of law, have enforced, promoted, encouraged, and sanctioned a policy, practice, and/or custom of excessive and unreasonable systemic Court Delay in Bronx Criminal Court.  By permitting, tolerating, sanctioning, and causing such widespread systemic Court Delay, Defendants have deprived Named Plaintiffs, as well as the members of the class they seek to represent, of their due process right to have a trial at a meaningful time and in a meaningful manner as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

### Second Claim for Relief
(Violations of the Sixth and Fourteenth Amendments)

161.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs.

162.    Defendants, acting under the color of law, have enforced, promoted, encouraged, and sanctioned a policy, practice, and/or custom of excessive and unreasonable systemic Court Delay in Bronx Criminal Court.  By permitting, tolerating, sanctioning, and causing such widespread systemic Court Delay, Defendants have deprived Named Plaintiffs, as well as the members of the class they seek to represent, of their right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983.

163.     Defendants, acting under the color of law, have enforced, promoted, encouraged, and sanctioned a policy, practice, and/or custom of excessive and unreasonable systemic Court Delay in Bronx Criminal Court.  By permitting, tolerating, sanctioning, and causing such widespread systemic Court Delay, Defendants have constructively deprived Named Plaintiffs, as well as the members of the class they seek to represent, of their right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

164.     Certify this action as a class action on behalf of the proposed class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

165.     Declare that Defendants' acts, practices, polices, and/or omissions deprive Plaintiffs of their rights under the Sixth and Fourteenth Amendments to the United States Constitution;

166.     Provide appropriate equitable relief;

167.     Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

168.     Grant such other and further relief as the Court may deem just and proper.

Dated:      January 23, 2017
             Bronx, New York

THE BRONX DEFENDERS

By: _____

Scott D. Levy
Johanna B. Steinberg
360 East 161st Street
Bronx, NY 10451
(718) 838-7878
scottl@bronxdefenders.org
johannas@bronxdefenders.org

EMERY CELLI BRINCKERHOFF &
ABADY LLP

Matthew D. Brinckerhoff
Ilann M. Maazel
Douglas E. Lieb
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000
mbrinckerhoff@ecbalaw.com
imaazel@ecbalaw.com
dlieb@ecbalaw.com

MORRISON & FOERSTER LLP

Gary S. Lee
Ruti Smithline
Jennifer K. Brown
Katie L. Viggiani
James A. Newton
250 West 55th Street
New York, NY 10019
(212) 468-8000
glee@mofo.com
rsmithline@mofo.com
jbrown@mofo.com
kviggiani@mofo.com
jnewton@mofo.com

*Attorneys for Plaintiffs*